Edward F. NORTON, III and Ken Poesl, Plaintiffs Below Appellants,

v.

K–SEA TRANSPORTATION PARTNERS L.P., K–SEA General Partner L.P., K–Sea General Partner GP LLC, James C. Baker, Timothy J. Casey, James J. Dowling, Brian P. Friedman, Kevin S. Mccarthy, Gary D. Reaves, Anthony S. Abbate, Barry J. Alperin and Frank Salerno, Defendants Below Appellees.

No. 238, 2012.

Supreme Court of Delaware.

Submitted: Feb. 8, 2013.
Decided: May 28, 2013.

Carmella P. Keener, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware. Of Counsel: Ethan D. Wohl (argued) and J. Elazar Fruchter, Wohl & Fruchter LLP, New York, New York, attorneys for appellants.

Srinivas M. Raju and Jillian G. Remming, Richards, Layton & Finger, P.A., Wilmington, Delaware. Of Counsel: Blair Connelly (argued), Latham & Watkins LLP, New York, New York; Alan E. Kraus, Latham & Watkins LLP, Newark, New Jersey attorneys for appellees K–Sea Transportation Partners L.P., K–Sea General Partner L.P., K–Sea General Partner GP LLC, K–Sea IDR Holdings LLC, James C. Baker, Timothy J. Casey, James J. Dowling, Brian P. Friedman, Kevin S. McCarthy, and Gary D. Reaves.

John L. Reed, DLA Piper LLP, Wilmington, Delaware. Of Counsel: Timothy E. Hoeffner, DLA Piper LLP, Philadelphia, Pennsylvania for appellees Anthony S. Abbate, Barry J. Alperin, and Frank Salerno.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

STEELE, Chief Justice:

In this appeal, we consider a general partner's obligations under a limited partnership agreement. The plaintiffs allege that the general partner obtained excessive consideration for its incentive distribution rights when an unaffiliated third party purchased the partnership. Importantly, the plaintiffs do not allege that the general partner breached the implied covenant of good faith and fair dealing. We conclude that the limited partnership agreement's conflict of interest provision created a contractual safe harbor, not an affirmative obligation. Therefore, the general partner needed only to exercise its discretion in good faith, as the parties intended that term to be construed, to satisfy its duties under the agreement. The general partner obtained an appropriate fairness opinion, which, under the agreement, created a conclusive presumption that the general partner made its decision in good faith. Therefore we **AFFIRM** the Court of Chancery's dismissal of the complaint.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

### A. The Parties

This case arises out of the Merger of K–Sea Transportation Partners L.P. (K–Sea or the Partnership) and Kirby Corporation. K–Sea operates a barge and tugboat fleet that transports refined petroleum

---

1. Unless otherwise stated, these facts are drawn from the plaintiffs' Verified Consolidated Amended Class Action Complaint (the Complaint) and the Vice Chancellor's opinion. *In re K–Sea Transp. Partners L.P. Unitholders Litig.*, 2012 WL 1142351 (Del.Ch. Apr. 4, 2012).

products between American ports. Before the Merger, K–Sea was a publicly traded Delaware limited partnership. The Fourth Amended and Restated Agreement of Limited Partnership (the LPA) created K–Sea's governance structure. Plaintiffs Edward F. Norton III and Ken Poesl (Norton) represent a class consisting of K–Sea's unaffiliated former common unitholders.

K–Sea's general partner is K–Sea General Partner L.P. (K–Sea GP), which is also a Delaware limited partnership. K–Sea GP's general partner is K–Sea General Partner GP LLC (KSGP), a Delaware limited liability company that ultimately controls K–Sea. Anthony S. Abbate, Barry J. Alperin, James C. Baker, Timothy J. Casey, James J. Dowling, Brian P. Friedman, Kevin S. McCarthy, Gary D. Reaves II, and Frank Salerno served on KSGP's board of directors (the K–Sea Board) during the Merger negotiations. Directors Abbate, Alperin, and Salerno comprised the K–Sea Board's Conflicts Committee. K–Sea, K–Sea GP, KSGP, and the K–Sea Board members are the Defendants in this action.

## B. K–Sea's Capital Structure and Ownership

At the time of the Merger, K–Sea's equity was divided among K–Sea GP, the common unitholders, and a class of preferred units held by KA First Reserve, LLC (KAFR). The common unitholders held 49.8% of the total equity, KAFR held

49.9%, and K–Sea GP's general partner interest comprised the remaining 0.3%.

In addition to its general partner interest, K–Sea GP held incentive distribution rights (IDRs) through a wholly owned affiliate.[2] These IDRs entitled K–Sea GP to increasing percentages of K–Sea's distributions once payments to the limited partners exceeded certain levels.[3] K–Sea GP would not receive payments on the IDRs until *quarterly* distributions reached $0.55 per unit. K–Sea's conservative estimates indicated that *annual* distributions would not reach $0.55 per unit until 2015. Norton extrapolates these projections to show that K–Sea would not reach the $0.55–per–unit quarterly threshold until the mid–2030s. Based on these projections, the IDRs were worth as little as $100,000.

## C. The K–Sea Board Issues Phantom Units to the Conflicts Committee Members

In December 2010, the K–Sea Board approved incentive compensation for the Conflicts Committee members,[4] each of whom received 15,000 phantom K–Sea common units. These phantom units vested over five years, but became immediately payable if a change of control occurred. These phantom units represented a significant component of Abbate's, Alperin's, and Salerno's equity interests in K–Sea.[5] The LPA, however, prohibited Conflicts Committee members from holding any owner-

---

2. For simplicity, this opinion refers to the IDRs as if K–Sea GP held them directly.

3. Many master limited partnerships use IDRs to incentivize the general partner to maximize cash flow for the limited partners. *See Lonergan v. EPE Holdings LLC*, 5 A.3d 1008, 1012 (Del.Ch.2010). As distributions to the limited partners increase, IDRs give the general partner a greater percentage of the cash flows generated by the limited partnership. *Id.*

4. Director Casey, who serves as KSGP's CEO, received 75,000 K–Sea phantom units in December 2010 as well.

5. Before the phantom unit grant, Abbate, Alperin, and Salerno owned 28,500, 13,500, and 7,800 K–Sea common units, respectively.

ship interest in K–Sea other than common units.[6]

### D. Kirby Approaches K–Sea and Negotiates the Merger

Shortly after the phantom unit grant, Kirby's CEO communicated with McCarthy, who also served as a director designee of KAFR, to discuss a strategic transaction between Kirby and K–Sea. On February 2, 2011, McCarthy informed Dowling, the K–Sea Board's Chairman, of those discussions. K–Sea and Kirby then extended a confidentiality agreement they had previously signed, and K–Sea provided Kirby with due diligence.

On February 9, 2011, Kirby offered to pay $306 million for K–Sea's common and preferred units. After discussing the offer with the K–Sea Board, McCarthy rejected it and informed Kirby that future offers should include consideration for K–Sea GP's general partner interest and its IDRs. Kirby responded the next day with a $316 million offer for all of K–Sea's equity interests, but McCarthy again rejected the offer as inadequate. On Febru-

ary 15, 2011, Kirby offered $329 million for K–Sea, which included an $18 million payment for the IDRs (the IDR Payment).[7]

### E. K–Sea Activates its Conflicts Committee to Consider the Merger

When the K–Sea Board met to consider Kirby's new offer, it acknowledged that the IDR Payment created a "possible conflict of interest"[8] and referred the proposed Merger to the Conflicts Committee for a recommendation. Under the LPA, the Conflict Committee's approval of a transaction would constitute "Special Approval," which purportedly would limit the unitholders' ability to challenge the transaction.

The Conflicts Committee hired Stifel, Nicolaus & Co. (Stifel) and DLA Piper LLP as its independent financial and legal advisors, respectively. Stifel valued K–Sea's common units using a distribution discount model based on K–Sea's internal projections. After valuing the common units, Stifel opined that the consideration K–Sea's unaffiliated common unitholders received[9] was fair from a financial view-

---

6. The LPA defines the Conflicts Committee as

> a committee of the [K–Sea Board] composed entirely of two or more directors who are not (a) security holders, officers or employees of [K–Sea GP], (b) officers, directors or employees of any Affiliate of [K–Sea GP] or (c) *holders of any ownership interest in the Partnership Group other than Common Units* and who also meet the independence standards required of directors who serve on an audit committee of a board of directors by the Securities Exchange Act of 1934 ... and by the National Securities Exchange on which the Common Units are listed for trading.

App. to Opening Br. at A026 (emphasis added).

7. The parties' briefs are unclear about whether Kirby paid K–Sea GP $18 million for the IDRs alone or for the general partner interest

as well as the IDRs. K–Sea and Kirby's Amended Registration Statement Form S–4 indicates that the $18 million was for the IDRs alone, but the distinction is not material to our decision. App. to Opening Br. at A169. We may consider the LPA and portions of the Form S–4 because the Complaint incorporates them by reference. *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del.2006).

8. Norton does not provide a citation for this quotation. Because the phrase appears in the S–4, we attribute the quote to the K–Sea Board for the purposes of a motion to dismiss. App. to Opening Br. at A240.

9. Although Stifel's opinion only addressed the Merger's fairness to the *unaffiliated* common unitholders, the record indicates that Kirby treated all common unitholders identically.

point.[10] The fairness opinion expressly did not consider "the fairness of the amount or nature of any compensation to any of the officers, directors or employees of K–Sea or its affiliates . . . relative to the compensation of the public holders of K–Sea's equity securities."[11]

### F. The K–Sea Board Approves the Merger and the Transaction Closes

After reviewing Stifel's fairness opinion, the Conflicts Committee unanimously recommended the Merger to the K–Sea Board, which also approved it. Like Stifel's fairness opinion, the Conflicts Committee's recommendation did not refer to the IDR Payment. K–Sea and Kirby then entered into a definitive merger agreement and disseminated a Form S–4 recommending that the common unitholders vote in favor of the Merger. A majority of K–Sea's unitholders voted in favor of the transaction, and the Merger closed on July 1, 2011. As finally negotiated, K–Sea's common unitholders received $8.15 per unit[12] and K–Sea GP received $18 million for the IDRs. The consideration represented a 26% premium over K–Sea's March 11, 2011 closing price.

### G. Procedural History

Shortly after K–Sea announced the Merger, Norton filed a class action complaint in the Court of Chancery. As amended, the Complaint contained four counts. Count I alleged that the Conflicts Committee members breached their fiduciary duties by recommending the Merger without evaluating the IDR Payment's fairness. In Count II, Norton contended that K–Sea GP, KSGP, and the K–Sea Board members breached the LPA by proposing, approving, and participating in an unfair transaction based on an inadequate review process. In Count III, Norton accused K–Sea GP, KSGP and the K–Sea Board of breaching the LPA by approving the Merger in reliance on the improperly constituted Conflicts Committee's Special Approval. Count IV alleged that K–Sea GP, KSGP, and the K–Sea Board breached their duty of disclosure by authorizing the dissemination of a materially misleading Form S–4. The Vice Chancellor denied Norton's motion for expedited discovery.[13]

After the parties submitted initial briefing on Defendants' motion to dismiss, the Vice Chancellor contacted the parties and advised them that he had reached a preliminary decision to grant the Defendants' motion. His rationale relied upon an interpretation of the LPA that neither party had argued nor briefed, and so he invited supplemental briefing. After reviewing the parties' submissions, the Vice Chancellor dismissed Norton's Complaint.[14] Norton appeals from the Vice Chancellor's dismissal of Counts I, II, and III of that Complaint.[15]

### II. STANDARD OF REVIEW

We review the Vice Chancellor's decision to grant a motion to dismiss under

---

10. *Id.* at A296.

11. *Id.* at A250 (internal quotation marks omitted).

12. K–Sea's common unitholders had the option to receive either a cash payment or a combination of cash and Kirby stock. KAFR received the same value for each preferred unit, but the Merger Agreement required it to accept the cash-stock combination.

13. *In re K–Sea Transp. Partners L.P. Unitholders Litig.,* 2011 WL 2410395 (Del.Ch. Jun. 10, 2011).

14. *In re K–Sea Transp. Partners L.P. Unitholders Litig.,* 2012 WL 1142351 (Del.Ch. Apr. 4, 2012).

15. Norton does not appeal the Vice Chancellor's dismissal of Count IV.

Court of Chancery Rule 12(b)(6), *de novo.*[16] When reviewing a motion to dismiss, we accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor.[17] Dismissal is appropriate only if we conclude that the plaintiff would not be entitled to relief under any set of facts that he could prove to support the claims asserted.[18] We do not, however, credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor.[19]

## III. ANALYSIS

### A. What Contractual Standards Apply to the Merger?

■ Limited partnership agreements are a type of contract. We, therefore, construe them in accordance with their terms to give effect to the parties' intent.[20] We give words their plain meaning unless it appears that the parties intended a special meaning.[21] When interpreting contracts, we construe them as a whole and give effect to every provision if it is reasonably possible.[22] A meaning inferred from a particular provision cannot control the agreement if that inference conflicts with the agreement's overall scheme.[23] We consider extrinsic evidence only if the contract is ambiguous.[24] A contract is not ambiguous "simply because the parties do not agree upon its proper construction," but only if it is susceptible to two or more reasonable interpretations.[25] If the contractual language at issue is ambiguous and if the limited partners did not negotiate for the agreement's terms, we apply the *contra proferentem* principle and construe the ambiguous terms against the drafter.[26]

■ The Delaware Revised Uniform Limited Partnership Act (DRULPA) gives "maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."[27] Parties may expand, restrict, or eliminate any fiduciary duties that a partner or other person might otherwise owe, but they "may not eliminate the implied contractual covenant of good faith and fair dealing."[28]

**16.** *In re General Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 167–68 (Del.2006) (citing *Malpiede v. Townson,* 780 A.2d 1075, 1082 (Del.2001)).

**17.** *Id.* at 168 (citing *Malpiede,* 780 A.2d at 1082).

**18.** *Gantler v. Stephens,* 965 A.2d 695, 703 (Del.2009) (citing *Feldman v. Cutaia,* 951 A.2d 727, 731 (Del.2008)).

**19.** *Id.* at 704 (citing *General Motors,* 897 A.2d at 168).

**20.** *In re Nantucket Is. Assocs. Ltd. P'ship Unitholders Litig.,* 810 A.2d 351, 361 (Del.Ch. 2002).

**21.** *AT & T Corp. v. Lillis,* 953 A.2d 241, 252 (Del.2008) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 739 (Del.2006)).

**22.** *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.,* 36 A.3d 776, 779 (Del. 2012) (citing *E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985)).

**23.** *Id.* (citing *E.I. du Pont de Nemours & Co.,* 498 A.2d at 1113).

**24.** *AT & T,* 953 A.2d at 253 (citing *Appriva S'holder Litig. Co. v. EV3, Inc.,* 937 A.2d 1275, 1291 (Del.2007)).

**25.** *Id.* at 252 (quoting *Lorillard,* 903 A.2d at 739).

**26.** *SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 43 (Del.1998).

**27.** 6 *Del. C.* § 17–1101(c).

**28.** 6 *Del. C.* § 17–1101(d).

## B. The LPA's Provisions Governing Mergers and Creating Contractual Fiduciary Duties

Unfortunately, limited partnership agreements that attempt to modify, rather than eliminate, fiduciary duties often create a Gordian knot of interrelated standards in different sections of the agreement.[29] This LPA requires us to parse several provisions to determine which standards apply to the Merger. The LPA creates procedures for mergers in Article XIV. Section 14.2 of Article XIV establishes that K–Sea GP must approve any proposed merger. K–Sea GP may consent to a merger "in the exercise of its discretion."[30] Section 7.9(b), which attempts to clarify the nebulous "discretion" standard, provides:

> Whenever this Agreement ... provides that [K–Sea GP] ... is permitted or required to make a decision (i) in its "sole discretion" or "discretion," ... except as otherwise provided herein, [K–Sea GP] ... shall be entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest of, or factors affecting, the Partnership ... [or] any Limited Partner

... [and] (ii) it may make such decision in its sole discretion (regardless of whether there is a reference to "sole discretion" or "discretion") unless another express standard is provided for.... [31]

Therefore, when K–Sea GP decides whether to consent to a merger, it may "consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest of, or factors affecting" K–Sea or its limited partners.[32] The limited partners' ultimate right to reject a merger under Section 14.3 practically limits that discretion however.[33]

The LPA limits Section 14.2's broad grant of discretion in Section 7.10(d), which provides:

> Any standard of care and duty imposed by [the LPA] or [DRULPA] ... shall be modified, waived or limited, to the extent permitted by law, as required to permit [K–Sea GP] to act under [the LPA] ... and to make any decision pursuant to the authority prescribed in [the LPA], *so long as such action is reasonably believed by [K–Sea GP] to be in, or not inconsistent with, the best interests of the Partnership.*[34]

---

29. *See, e.g., Gelfman v. Weeden Investors., L.P.,* 792 A.2d 977, 986 (Del.Ch.2001) (bemoaning the "head-spinning quality" of a limited partnership agreement).

30. App. to Opening Br. at A141.

31. *Id.* at A118.

32. *Id.*

33. The LPA requires a "Unit Majority" to approve a merger or consolidation. *Id.* at A142. A Unit Majority is a majority of the "Outstanding Common Units," which includes KAFR's preferred units on an as-converted basis. *Id.* at A042. The LPA contains an exception to this rule. K–Sea GP can merge the Partnership solely to effect a change in the Partnership's legal form so long as the parties retain the same liabilities, rights, obligations, and federal income tax status. *Id.*

34. *Id.* at A119 (emphasis added). The LPA's addition of the term "reasonably" distinguishes it from limited partnership agreements that Delaware courts have interpreted as establishing a purely subjective good faith standard. *See, e.g., In re Atlas Energy Res., LLC Unitholder Litig.,* 2010 WL 4273122, at *12 (Del.Ch. Oct. 28, 2010) (noting that "while under Delaware's common law, 'the objective elements of good faith dominate the subjective element,' ... only the subjective intent of [the entity's] officers and directors matters when determining whether they acted in good faith").

If K–Sea GP were subject to common law fiduciary duties, it could not consent to a merger in its sole discretion.[35] Therefore, Section 7.10(d) eliminates any duties that otherwise exist and replaces them with a contractual fiduciary duty—namely, that K–Sea GP must reasonably believe that its action is in the best interest of, or not inconsistent with, the best interests of the Partnership.

Finally, the LPA broadly exculpates all Indemnitees (which no party disputes includes all the Defendants) so long as the Indemnitee acted in "good faith."[36] Although the LPA regrettably does not define "good faith" in this context, we cannot discern a rational distinction between the parties' adoption of this "good faith" standard and Section 7.10(d)'s contractual fiduciary duty, i.e., an Indemnitee acts in good faith if the Indemnitee reasonably believes that its action is in the best interest of, or at least, not inconsistent with, the best interests of K–Sea.[37] If we take seriously our obligation to construe the agreement's "overall scheme,"[38] we must conclude that the parties' insertion of a free-standing, enigmatic standard of "good faith" is consistent with Section 7.10(d)'s conceptualization of a reasonable belief that the action taken is in, or not inconsistent with, the best interests of the Partnership. In this LPA's overall scheme, "good faith" cannot be construed otherwise.

■ Thus, while the LPA does not require K–Sea GP to consider any particular interest or factor affecting the Partnership when exercising its discretion, K–Sea GP still must reasonably believe that its ultimate course of action is not inconsistent with K–Sea's best interests. Therefore, unless another provision supplants this standard, in order to state a claim that withstands Rule 12(b)(6), Norton must allege facts supporting an inference that K–Sea GP had reason to believe that it acted inconsistently with the Partnership's best interests when approving the Merger.

## C. Does Section 7.9(a) Impose Additional Obligations that Supplant Section 14.2's Discretion Standard?

Norton contends that the LPA's generally applicable discretion standard for mergers must yield to Section 7.9(a), the provision governing conflicts of interest, which he argues requires K–Sea GP to establish that the Merger was fair and reasonable. The LPA contemplates that conflicts of interest may arise, and Section 7.9(a) establishes procedures for curing these conflicts. Section 7.9(a) provides:

> Unless otherwise expressly provided in [the LPA], ... whenever a potential conflict of interest exists or arises between [K–Sea GP], on the one hand, and the Partnership ... on the other, any resolution or course of action by [K–Sea GP] in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of [the LPA] ... or of any duty stated or implied by law or equity, if the resolution or course of action is, or ... is deemed to be, fair and reasonable to

---

**35.** See Miller v. Am. Real Estate Partners, L.P., 2001 WL 1045643, at *8 (Del.Ch. Sept. 6, 2001).

**36.** App. to Opening Br. at A116.

**37.** See Gelfman v. Weeden Investors., L.P., 792 A.2d 977, 986–87 (Del.Ch.2001) (interpreting similar language).

**38.** GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 779 (Del. 2012) (citing E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1113 (Del. 1985)).

the Partnership. [K–Sea GP] shall be authorized but not required ... to seek Special Approval of such resolution. Any ... resolution of such conflict of interest shall be conclusively deemed fair and reasonable to the Partnership if such conflict of interest or resolution is (i) *approved by Special Approval* ..., (ii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iii) fair to the Partnership.... [K–Sea GP] shall be authorized ... to consider (A) the relative interests of any party to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interest ... and (D) such additional factors as [K–Sea GP] ... determines in its sole discretion to be relevant, reasonable or appropriate under the circumstances. Nothing contained in [the LPA], however, is intended to nor shall it be construed to require [K–Sea GP] (including the Conflicts Committee) to consider the interests of any Person other than the Partnership.... [39]

If Section 7.9(a) requires K–Sea GP to establish that the Merger was fair and reasonable to K–Sea, we must consider whether the grant of phantom units to the Conflicts Committee tainted the Special Approval process. If, however, Section 7.9(a) does not impose that affirmative obligation on K–Sea GP, we do not need to reach the issue unless Norton has pleaded a violation of the LPA's more lenient discretion standard.

Section 7.9(a) applies "whenever a potential conflict of interest exists or arises." [40] Norton alleges that the IDR Payment created a conflict of interest because K–Sea GP did not share the IDR Payment with any other unitholder. The IDR Payment motivated K–Sea GP to increase the amount of consideration K–Sea GP received at the expense of the consideration paid to the other unitholders. Accepting these well-pleaded allegations as true,[41] the IDR Payment created a conflict of interest and Section 7.9(a) applies by its terms. Section 7.9(a)'s applicability does not necessarily mean that it displaces Section 14.2's discretion standard, however. If Section 7.9(a) is only a safe harbor, the phrase "whenever a potential conflict of interest exists or arises" merely means that the safe harbor is available whenever there is a potential conflict of interest.

The provision's plain language indicates that if K–Sea GP's resolution of a conflict of interest is fair and reasonable or is deemed to be fair and reasonable, that resolution is not a breach of the LPA. This statement's contrapositive is that if K–Sea GP's resolution of a conflict of interest is a breach of the LPA, then it is not fair and reasonable. Norton arrives at his construction by inverting Section 7.9(a), *i.e.*, he argues that a resolution of a conflict of interest that is not fair and reasonable *is* a breach of the LPA. Unlike the contrapositive, Section 7.9(a)'s inverse does not necessarily follow.

■ Recognizing that Section 7.9(a)'s text does not mandate his construction, Norton argues that other portions of the section and the LPA weigh in its favor. Section 7.9(a) states that "[K–Sea GP] shall be authorized but not required ... to seek Special Approval." [42] Norton con-

39. App. to Opening Br. at A117.

40. *Id.*

41. *In re General Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 167–68 (Del.2006) (citing *Malpiede v. Townson,* 780 A.2d 1075, 1082 (Del.2001)).

42. App. to Opening Br. at A117.

tends that, because under the LPA Special Approval is optional, that implies that Section 7.9(a) as a whole is mandatory. We disagree. Read in context, this language means that K–Sea GP is not required to obtain Special Approval in every case where a conflict of interest arises. For example, K–Sea GP may determine that the transaction is "on terms no less favorable to the Partnership than those ... available from unrelated third parties" or "fair to the Partnership" to resolve the conflict.[43] That example underscores that K–Sea GP does not need to resolve a conflict of interest through the Conflicts Committee. The language does not make the entire Section mandatory by implication.

Other LPA provisions support the Vice Chancellor's construction of Section 7.9(a). Section 7.6(d) governs transactions between K–Sea GP and the Partnership, which necessarily involve a conflict of interest. That Section begins by stating that "[n]either [K–Sea GP] nor any of its Affiliates shall sell ... any property to, or purchase any property from, the Partnership ... except pursuant to transactions that are fair and reasonable to the Partnership."[44] This language creates an affirmative obligation—K-Sea GP may not engage in a transaction with the Partnership unless the transaction is "fair and reasonable."[45] Section 7.6(d) indicates that the LPA's drafters knew how to im-

pose an affirmative obligation when they so intended, and that Section 7.9(a)'s language does not result from sloppy drafting.

Section 7.9(c) also weighs against Norton's interpretation. That Section provides that "[w]henever a particular ... resolution of a conflict of interest is required ... to be 'fair and reasonable' ... the fair and reasonable nature of such ... resolution shall be considered in the context of all similar or related transactions."[46] This language indicates that not all resolutions of conflicts of interest are required to meet a "fair and reasonable" standard.

This LPA differs from the limited partnership agreement in *Gelfman v. Weeden Investors*, which Norton contends supports his interpretation.[47] In *Gelfman*, the conflict of interest provision required the general partner to "resolve such conflict of interest" and then mandated that, in resolving the conflict, the general partner consider specific factors.[48] No similar mandate appears in Section 7.9(a).

Therefore, the Vice Chancellor correctly held that Section 7.9(a) is "a permissive safe harbor."[49] Our construction of the LPA indicates that Section 14.2's "discretion" standard applies to mergers generally, and that K–Sea GP may (if it so chooses) take advantage of Section 7.9(a)'s safe

---

43. *Id.*

44. *Id.* at A114.

45. *See also Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC*, 986 A.2d 370, 386–87 (Del.Ch. 2010) (analyzing transactions between an affiliate of the general partner and the limited partnership under a similar provision).

46. App. to Opening Br. at A118.

47. *Gelfman v. Weeden Investors., L.P.*, 792 A.2d 977 (Del.Ch.2001).

48. *Id.* at 985.

49. *In re K–Sea Transp. Partners L.P. Unitholders Litig.*, 2012 WL 1142351, at *8 (Del.Ch. Apr. 4, 2012); *see also In re Encore Energy Partners LP Unitholder Litig.*, 2012 WL 3792997, at *12 (Del.Ch. Aug. 31, 2012) (referring to a similar provision as a "contractual safe harbor"); *In re Inergy L.P. Unitholder Litig.*, 2010 WL 4273197, at *12 n. 109 (Del. Ch. Oct. 29, 2010) (same).

harbor provisions to resolve any conflict of interest relating to a merger.[50] A resolution of a conflict of interest that is actually, or is deemed to be, fair and reasonable is deemed approved and is not a breach of the LPA. If K–Sea GP does not meet that standard, however, that does not automatically put K–Sea GP in breach of the LPA.[51]

This interpretation achieves the goal of giving each LPA term an independent meaning.[52] If Section 7.9(a) were construed to impose an affirmative obligation on K–Sea GP, it would be unclear whether Section 7.6(d)'s affirmative obligation relating to transactions between K–Sea GP and K–Sea—which addresses a specific conflict of interest and contains parallel provisions—has any independent meaning or serves any independent purpose.

■ Defendants' initial failure to argue for this construction of the LPA does not alter our analysis. Because Section 7.9(a) is unambiguous, we will not rely on extrinsic evidence to aid our interpretation of the LPA.[53] Norton's reliance on *Sonitrol Holding Co. v. Marceau Investissements*[54] is misplaced. In *Sonitrol* the defendant's interpretation of the contract directly contradicted its previous interpretation and its own documents confirmed the plaintiff's interpretation.[55] Here, although Defendants did not argue that Section 7.9(a) was permissive until the Vice Chancellor asked for supplemental briefing, Norton cites no portion of the record where Defendants argued Section 7.9(a) was mandatory.[56]

---

**50.** *See DCV Holdings, Inc. v. ConAgra, Inc.,* 889 A.2d 954, 961 (Del.2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.") (citations omitted); *Katell v. Morgan Stanley Grp., Inc.,* 1993 WL 205033, at *4 (Del.Ch. Jun. 8, 1993) (holding that specific provisions in a limited partnership agreement ordinarily qualify general ones).

**51.** Our conclusion does not alter the holding of *Sonet v. Timber Co., L.P.,* 722 A.2d 319 (Del.Ch.1998). In *Sonet,* the Chancellor assumed that a similar conflict of interest provision imposed a fair and reasonable standard " '[u]nless otherwise expressly provided' " and concluded that the conflict of interest provision must yield to the "sole discretion" standard in that LPA's merger provision. *Id.* at 325–26 (alteration in original). He reasoned that "[i]t makes no sense, therefore, for the decision to merge to be 'deemed' approved because, pursuant to [the merger provision], it must *actually* be approved." *Id.* at 325. Here, we conclude that Section 7.9(a) does not impose a "fair and reasonable" standard, and therefore does not conflict with Section 14.2's discretion standard—a result that is consistent with the Chancellor's conclusion in *Sonet* that a discretion standard governed mergers. *Id.* at 326.

**52.** *See Osborn ex rel. Osborn v. Kemp,* 991 A.2d 1153, 1159 (Del.2010) (citing *Kuhn Constr., Inc. v. Diamond State Port Corp.,* 990 A.2d 393, 396–97 (Del.2010)) (noting that Delaware courts interpret contracts to avoid rendering any part of the contract mere surplusage).

**53.** *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.,* 36 A.3d 776, 783 (Del. 2012) (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del. 1997)).

**54.** 607 A.2d 1177 (Del.1992). In *Sonitrol,* we held that the relevant agreement was unambiguous, and therefore the discussion of the defendant's presuit conduct was dicta. *See id.* at 1182 ("Because we find the language of Section 4.7 unambiguous on its face, we need not consider any extrinsic evidence when interpreting the section.").

**55.** *Id.* at 1182.

**56.** Similarly, while we will construe an ambiguous partnership agreement against the drafter under the *contra proferentem* doctrine, that doctrine only applies if the partnership agreement is ambiguous. *SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 43 (Del.1998); *see also Bank of N.Y. Mellon v. Commerzbank Capital Funding Trust II,* 65 A.3d 539, 552 (Del.2013)

Because Section 7.9(a) does not impose any additional affirmative duties on K–Sea GP, our analysis focuses on the otherwise controlling standard—whether K–Sea GP exercised its discretion to approve the Merger in good faith, (*i.e.*, with a reasonable belief that its actions were in, or not inconsistent with, the best interests of K–Sea).[57] In order to state a claim that survives a motion to dismiss under Rule 12(b)(6), Norton must plead facts supporting a reasonable inference that K–Sea GP, the only defendant with a duty relating to the Merger's approval, acted inconsistently with the Partnership's best interests. If Norton's complaint cannot establish a breach of the contract's "good faith" standard, we need not reach whether the phantom unit grant disqualified the Conflicts Committee members and invalidated the Special Approval process.

Here, Norton has alleged that the IDR Payment created a conflict of interest between K–Sea GP and the Partnership because K–Sea GP obtained consideration that did not flow to the common unitholders. At the motion to dismiss stage we must draw all inferences in Norton's favor. We therefore could conclude that K–Sea GP used its position to extract an excessive amount of consideration for its IDRs at the expense of the limited partners. That permits us to infer that K–Sea GP may not have acted in good faith when it approved the Merger and submitted it to the unitholders for approval. That raises the next issue, which is whether Norton has pled a cognizable claim that K–Sea GP did not act in good faith.

### D. Did the Investment Banker's Fairness Opinion Create a Conclusive Presumption of Good Faith?

In addressing that issue, we must consider yet another LPA provision addressing K–Sea GP's obligation to act in "good faith." That provision creates a conclusive presumption that K–Sea GP has acted in good faith if K–Sea GP relies on a competent expert's opinion. Section 7.10(b) provides that

[K–Sea GP] may consult with ... investment bankers ... and any act taken or omitted to be taken in reliance upon the opinion ... of such Persons as to matters that [K–Sea GP] reasonably believes to be within such Person's professional or expert competence *shall be conclusively presumed to have been done or omitted in good faith* and in accordance with such opinion.[58]

The Conflicts Committee obtained Stifel's opinion that the consideration that Kirby paid to K–Sea's unaffiliated common unitholders was financially fair. No party alleges that Stifel lacked the requisite ex-

(construing an agreement against the drafter to give effect to a purchaser's "reasonable expectations"); *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del.1996) (same). Here, however, the LPA is not "fairly susceptible" to different interpretations and therefore *contra proferentem* is inapplicable. *SI Mgmt.*, 707 A.2d at 42 (citing *Eagle Indus.*, 702 A.2d at 1232).

**57.** Our construction of Section 7.9(a) is consistent with the Chancellor's conclusion in *Gelfman v. Weeden Investors, L.P.*, 792 A.2d 977 (Del.Ch.2001). The *Gelfman* limited

partnership agreement required the general partner to consider specific factors when resolving a conflict of interest, which the Vice Chancellor concluded must yield to the "sole discretion" standard in another section of the limited partnership agreement. *See id.* at 985–86 ("[W]henever a conflict of interest exists ... the General Partner shall resolve such conflict of interest...."). Here, there is no conflict, because Section 7.9(a) does not impose any such mandatory obligation.

**58.** App. to Opening Br. at A119 (emphasis added).

pertise to render that opinion. Norton nowhere claims that the opinion did not state that the Merger was fair, nor does he allege that the analyses underlying the fairness opinion were flawed. Rather, he alleges that K–Sea extracted a larger portion of the consideration than the IDRs' value justified. We note also that Norton does not claim on appeal that Defendants' actions breached the implied covenant of good faith and fair dealing.

Norton argues that K–Sea GP is not entitled to a conclusive presumption of good faith because Stifel did not specifically address the IDR Payment's fairness— the reason why K–Sea GP activated the Conflicts Committee. He concedes that the unaffiliated unitholders received a fair price, and he correctly notes that a limited partnership's value is not a single number, but a range of fair values.[59] While we understand Norton's frustration, the LPA's provisions control.

■■■ The LPA does not require K–Sea GP to evaluate the IDR Payment's reasonableness separately from the remaining consideration. Section 7.9(a) explicitly states that nothing in the LPA shall be construed to require K–Sea GP to consider the interests of any person other than the Partnership. That Section authorizes (but does not require) K–Sea GP to consider

the "relative interests of any party to such conflict."[60] These provisions indicate that K–Sea GP was not required to consider whether the IDR Payment was fair, but only whether the Merger as a whole was in the best interests of the Partnership (which included the general partner and the limited partners).[61] Because of those clear provisions, Norton had no reasonable contractual expectation that K–Sea GP or the Conflict Committee's retained investment banker would specifically consider the IDR Payment's fairness.

■■■ Because Stifel's opinion satisfied the LPA's requirements, we next address whether that opinion entitles *K–Sea GP* to a conclusive presumption of good faith.[62] Although the Conflicts Committee of the K–Sea Board actually obtained the fairness opinion, it is unreasonable to infer that the entire K–Sea Board did not rely on the opinion that a K–Sea Board subcommittee obtained. Similarly, because K–Sea GP is a "pass-through" entity controlled by KSGP, the only reasonable inference is that K–Sea GP relied on the fairness opinion. K–Sea GP is therefore conclusively presumed to have acted in good faith when it approved the Merger and submitted it to the unitholders for a vote. That process satisfied K–Sea GP's contractual duty to exercise its discretion

---

**59.** *Reis v. Hazelett Strip–Casting Corp.,* 28 A.3d 442, 466 (Del.Ch.2011) (quoting *Cede & Co. v. Technicolor, Inc.,* 2003 WL 23700218, at *2 (Del.Ch. Dec. 31, 2003) (internal quotation marks omitted), *aff'd in part, rev'd in part on other grounds,* 884 A.2d 26 (Del.2005)).

**60.** App. to Opening Br. at A118–19.

**61.** The Defendants argue that Stifel's opinion went beyond the LPA's requirements because it stated that the consideration Kirby paid to the limited partners was fair, as opposed to the consideration paid to K–Sea as a whole. We do not address whether, under these facts, a fairness opinion that only addressed a trans-

action's fairness to the limited partnership as a whole would satisfy a general partner's duties under the LPA or any other legal theory.

**62.** We note that the conclusive presumption provision purports to dramatically restrict the unitholders' ability to challenge a conflicted transaction. Our discussion of that provision is limited to the facts before us. Because the parties raise no issue regarding the Vice Chancellor's discussion addressing the implied covenant of good faith and fair dealing, we do not opine or otherwise comment on the implied covenant of good faith and fair dealing in this Opinion.

in "good faith" (as this LPA defines the term).

Norton willingly invested in a limited partnership that provided fewer protections to limited partners than those provided under corporate fiduciary duty principles. He is bound by his investment decision. Here, the LPA did not require K–Sea GP to consider separately the IDR Payment's fairness, but granted K–Sea GP broad discretion to approve a merger, so long as it exercised that discretion in "good faith". Reliance on Stifel's opinion satisfied this standard. By opining that the consideration Kirby paid to the unaffiliated unitholders was fair, Stifel's opinion addressed the IDR Payment's fairness, albeit indirectly. Kirby presumably was willing to pay a fixed amount for the entire Partnership.[63] If K–Sea GP diverted too much value to itself, at some point the consideration paid to the unaffiliated unitholders would no longer be "fair."

Furthermore, the LPA does not leave K–Sea's unitholders unprotected. K–Sea GP's approval merely triggered submission of the Merger to the unitholders for a majority vote.[64] If the unitholders were dissatisfied with the Merger's terms, "their remedy [was] the ballot box, not the courthouse." [65] Here K–Sea GP is conclusively presumed to have approved the Merger in good faith, and a majority of the unitholders voted to consummate it. The LPA required nothing more.

### E. Does the Complaint Plead a Claim Against the Remaining Defendants?

Norton's remaining claims are against the K–Sea Board members and KSGP. Here, we have held that K–Sea GP, the only Defendant with any duty relating to the approval of the Merger, is conclusively presumed to have acted in good faith and therefore has not breached the LPA. While that conclusive presumption only applies to K–Sea GP, Norton's only claim against the other defendants is that they caused K–Sea GP to enter into the Merger. Norton cannot state a cognizable claim for relief against the other defendants for causing K–Sea GP to take an action that did not breach K–Sea GP's duties under the LPA.[66] Accordingly, we uphold the dismissal of Norton's claims

---

63. See, e.g., In re John Q. Hammons Hotels Inc. S'holder Litig., 2009 WL 3165613, at *12 (Del.Ch. Oct. 2, 2009) (noting that majority and minority shareholders "were in a sense 'competing' " for portions of the consideration that a third party was willing to pay for a corporation).

64. App. to Opening Br. at A142 ("[K–Sea GP], upon its approval of the Merger Agreement, shall direct that the Merger Agreement be submitted to a vote of Limited Partners....").

65. Sonet v. Timber Co., L.P., 722 A.2d 319, 326 (Del.Ch.1998). In Sonet, the limited partnership agreement required a supermajority vote to consent to mergers, unlike the majority vote requirement in this LPA. Id. at 324. In both Sonet and this case, the general partner did not control the vote's outcome, so the distinction is not material. We do not express an opinion regarding whether a vote controlled by the general partner under these facts would create a viable cause of action.

66. See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 795 A.2d 1, 34 (Del.Ch. 2001) (holding that a corporate general partner's directors "cannot be held liable for breach of fiduciary duty in a situation where the [g]eneral [p]artner, because of its compliance with a contractual safe harbor, does not owe such liability"), aff'd in part, rev'd in part on other grounds, 817 A.2d 160 (Del.2002); Gelfman v. Weeden Investors., L.P., 792 A.2d 977, 992 n. 24 (Del.Ch.2001) (noting that a corporate general partner's directors' ability to disclaim liability for a breach of fiduciary duty depends on whether the corporate general partner has "properly invoked a contractual safe harbor").

against the remaining defendants.[67]

## IV. CONCLUSION

For these reasons, Norton has not stated a claim for relief that survives Defendants' Rule 12(b)(6) motion. Accordingly, the Court of Chancery's judgment is **AFFIRMED.**

---

67. The Vice Chancellor also concluded that Norton could not plead a breach of the implied covenant of good faith and fair dealing. He concluded that the LPA's conclusive presumption of good faith barred a claim under the implied covenant. *In re K–Sea Transp. Partners L.P. Unitholders Litig.,* 2012 WL 1142351, at *9–10 (Del.Ch. Apr. 4, 2012) (citing *Gerber v. Enterprise Prods. Holdings, LLC,* 2012 WL 34442, at *12–13 (Del.Ch. Jan. 6, 2012)). Because Norton does not appeal the Vice Chancellor's implied covenant holding, this argument is not before us on this appeal.