## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE KINDER MORGAN, INC.  ) CONSOLIDATED
CORPORATE REORGANIZATION  ) C.A. No. 10093-VCL
LITIGATION       )

## MEMORANDUM OPINION

Date Submitted: June 12, 2015
Date Decided: August 20, 2015

Elizabeth M. McGeever, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Norman Berman, Nathaniel L. Orenstein, BERMAN DEVALERIO, Boston, Massachusetts; Joseph J. Tabacco, Jr., BERMAN DEVALERIO, San Francisco, California; Jay W. Eng, BERMAN DEVALERIO, Palm Beach Gardens, Florida; *Attorneys for Plaintiff The Haynes Family Trust.*

Elizabeth M. McGeever, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Jason M. Leviton, Steven P. Harte, Joel A. Fleming, BLOCK & LEVITON LLP, Boston, Massachusetts; *Attorneys for Plaintiff William Bryce Arendt.*

Bradley R. Aronstam, S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Joseph S. Allerhand, Seth Goodchild, Adam J. Bookman, Amanda K. Pooler; WEIL, GOTSHAL & MANGES LLP, New York, New York; *Attorneys for Defendants Kinder Morgan, Inc., Kinder Morgan G.P., Inc., P Merger Sub LLC, Richard D. Kinder, and Steven J. Kean.*

David J. Teklits, Kevin M. Coen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; David D. Sterling, Danny David, BAKER BOTTS L.L.P., Houston, Texas; *Attorneys for Defendants Ted A. Gardner, Gary L. Hultquist, Perry M. Waughtal, Kinder Morgan Energy Partners, L.P., and Kinder Morgan Management, LLC.*

**LASTER, Vice Chancellor.**

The defendants have moved to dismiss the Verified Second Consolidated Amended Class Action Complaint (the "Complaint") for failing to state a viable claim. *See* Ct. Ch. R. 12(b)(6). When considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (footnotes and internal quotation marks omitted). The motion is granted.

## I. FACTUAL BACKGROUND

Defendant Kinder Morgan Energy Partners, L.P. (the "Partnership") was a master limited partnership organized under Delaware law. Its general partner was defendant Kinder Morgan G.P., Inc. (the "General Partner"), a wholly owned corporate subsidiary of defendant Kinder Morgan, Inc. ("Parent"). The General Partner delegated its authority to manage the Partnership to Kinder Morgan Management, LLC (the "GP Delegate"), a limited liability company that the General Partner controlled. Defendant Richard D. Kinder founded Parent, owned 24% of its equity, and served as its Chairman and CEO. He also served as Chairman and CEO of the General Partner, the GP Delegate, and the Partnership.

Before the transaction challenged in this litigation, Parent, the GP Delegate, and the Partnership were all publicly traded entities. So was El Paso Pipeline Partners, L.P. ("El Paso"), another master limited partnership that Parent controlled.

1

On July 17, 2014, Parent proposed a reorganization from which Parent would emerge as the only publicly traded entity. As part of the reorganization, the Partnership would merge with a wholly owned subsidiary of the General Partner, and the GP Delegate would merge with a different wholly owned subsidiary of the General Partner. Meanwhile, on the El Paso side, similar mergers would take place. This decision refers to the mergers, respectively, as the "MLP Merger," the "Delegate Merger," and the "El Paso Merger." The El Paso Merger does not figure prominently in the claims that are the subject of the motion to dismiss.

Parent's initial proposal for the MLP Merger contemplated Parent paying holders of the Partnership's common units a 10% premium over the closing price on the preceding day. The consideration would comprise a mix of 12% cash and 88% Parent stock that would be taxable to its recipients. Parent's initial proposal for the Delegate Merger contemplated that holders of shares in the GP Delegate would receive consideration having the same value provided to holders of the Partnership's common units, but consisting entirely of shares of Parent stock. The holders of GP Delegate shares would receive their consideration in a tax-free exchange. As noted, the consideration that GP Delegate stockholders would receive was priced at a 10% premium to the trading price of the common units, and the GP Delegate shares traded at a discount to the common units; mathematically the proposed consideration represented a premium of 18.31% to the last closing price of GP Delegate's shares.

Kinder allegedly caused Parent to propose equivalent consideration for the common units and the shares because he wanted them valued equally. According to the

2

Complaint, insiders owned more of GP Delegate's shares than the Partnership's common units. The Complaint quotes a May 22, 2014 presentation by Parent's CFO, Kimberly Dang, which stated "Insiders prefer KMR" (referring to the trading symbol for shares of the GP Delegate) over the common units of the Partnership. Compl. ¶ 127. The presentation supported this statement with the explanation that "management has purchased [GP Delegate shares] at a rate of ~2.3:1 vs. [common units of the Partnership], or ~4.2:1 excluding one transaction." *Id.*

At the time of Parent's proposal, the GP Delegate's shares traded at a 7% discount to the Partnership's common units. They historically traded at an average discount of more than 6%:



Because Parent controlled the Partnership through the General Partner, and because Parent would be acquiring 100% ownership of the Partnership through the MLP Merger, the transaction created a conflict of interest for the General Partner. The General Partner chose to address the conflict by seeking "Special Approval" under the Partnership's Third Amended and Restated Agreement of Limited Partnership dated as of

May 18, 2001, as amended (the "LP Agreement" or "LPA"). The LP Agreement defined Special Approval as "approval by a majority of the members of the Conflicts and Audit Committee." LPA Art. 2. The LP Agreement in turn defined the Conflicts and Audit Committee (the "Committee") as "a committee of the Board of Directors of the General Partner composed entirely of one or more directors who are neither officers nor employees of the General Partner or its Affiliates." *Id.* The LP Agreement defined the term "Affiliate" as

> [w]ith respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with, the Person in question. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise. For purposes of this Agreement, [the GP Delegate] is an Affiliate of [the General Partner].

*Id.* Members of the board of directors of the General Partner (the "GP Board") who were not otherwise officers or employees of the General Partner, the GP Delegate, or the General Partner's other affiliates could serve on the Committee.

After receiving Parent's proposal, the GP Board delegated authority to the Committee to negotiate the terms of the MLP Merger and, if it believed appropriate, grant Special Approval. Parent and the General Partner reserved the right to proceed with the MLP Merger without Special Approval. The members of the Committee were defendants Ted A. Gardner, Gary L. Hultquist, Perry M. Waughtal. They were members of the GP Board who were not officers or employees of the General Partner, the GP Delegate, or the General Partner's other Affiliates, as defined in the LP Agreement. The other two members of the GP Board were Kinder and defendant Steven J. Kean, the President,

COO, and a director of Parent. Kean held the same positions with the General Partner and the GP Delegate.

The GP Board did not get around to approving formal resolutions empowering the Committee until August 9, 2014, the day the MLP Merger was approved. The resolutions made clear that the Committee was only authorized to evaluate the MLP Merger or alternatives that involved Parent. It could not explore transactions involving third parties.

While serving as members of the Committee, Gardner, Hultquist, and Waughtal also served as the members of a special committee of the board of directors of GP Delegate charged with negotiating and evaluating the Delegate Merger. To distinguish the latter committee, this decision refers to it as the "Delegate Committee." The Complaint alleges that Gardner, Hultquist, and Waughtal faced a conflict of interest between their simultaneous roles on both committees. The Complaint alleges that as members of both committees, they compounded their conflict by engaging a single financial advisor and a single set of legal advisors.

The Complaint alleges that when negotiating and approving the MLP Merger, the Committee acceded to Parent's wishes in a number of ways. Initially, the Committee accommodated Parent's desire to move forward quickly. Compl. ¶ 121. Parent had been evaluating its alternatives, including the potential reorganization, since late 2013. Yet the Committee was forced to negotiate and evaluate the MLP Merger over the course of a month. The final deal was approved on August 9, 2014, and announced on August 10, less than four weeks after Parent made its initial proposal.

The Complaint alleges that because of the Committee members' desire to accommodate Parent, they were not sufficiently sensitive to conflicts. It was not until more than halfway through the process, on July 30, 2014, that the Committee and its advisors "discussed the issues presented by Messrs. Gardner, Hultquist and Waughtal serving on each of the [Committee] and the [Delegate Committee] and having the same advisors for each committee, as well as potential alternative approval structures including the appointment of additional directors to serve on either committee." *Id.* ¶ 131. The Committee elected to proceed without any changes, citing a perceived need to act quickly. The Complaint alleges that there was no urgency from the standpoint of the Partnership. Moreover, if time was of the essence, the conflict could have been resolved by having Gardner and Waughtal serve on the Delegate Committee while Hultquist continued on the Committee. That would have made sense because Gardner and Waughtal held larger financial stakes in the GP Delegate. The existing advisors could have continued to represent one of the two committees, and the other committee could have retained separate advisors within days. The Complaint describes the justifications for continuing with a unified structure as "plainly pretextual." *Id.* ¶ 132.

The Complaint alleges that the Committee members accommodated Parent on the substantive terms of the transaction. First, the Committee never challenged the Parent's insistence that GP Delegate stockholders and the Partnership's common unitholders receive the same consideration, notwithstanding the historical discount on the GP Delegate's shares or the tax-free treatment that the GP Delegate's stockholders would receive. The counterproposals that the Committee made contemplated equal

6

consideration, and under the final terms of the MLP Merger, each publicly held common unit was converted into the right to receive, at the election of the holder, (i) $91.72 in cash, (ii) 2.4849 shares of Parent common stock, or (iii) 2.1931 shares of Parent common stock and $10.77 in cash. The MLP Merger consideration was taxable regardless of the unitholder's election. Under the final terms of the Delegate Merger, each publicly held share was converted into the right to receive 2.4849 shares of Parent common stock. As Kinder wanted, holders of the GP Delegate's shares received the same value as holders of the Partnership's common units, and they received it in a tax-free exchange.

Second, the plaintiff has raised fair criticisms about the consideration that the Committee approved for the common units. By agreeing to a taxable transaction for the Partnership, the Committee effectively transferred a deferred tax benefit from holders of common units to Parent. Yet the Committee accepted in return taxable consideration at a level such that, after paying taxes, the average Partnership public unitholder received *less* than the Partnership's pre-transaction trading price. In addition, the Committee anticipated that the dividends which former unitholders would receive after the MLP Merger as stockholders of Parent would be lower than the distributions they would have received from the Partnership absent the MLP Merger. Not only that, but the distributions would be taxable.

Putting numbers behind these allegations, the Complaint contends that net of taxes, the holders of common units in the aggregate lost 4% of the value of their units as a result of the MLP Merger. By contrast, the GP Delegate's stockholders in the aggregate realized a 21% gain. The Complaint alleges that as a result of the MLP Merger, holders

7

of common units would receive in the aggregate 3% less income over the next five years (including 15% lower income in 2015) compared to what they would have received by remaining unitholders in the Partnership. Including taxes, holders of common units would receive 54% less income over the next five years.

Third, the Committee was largely ineffective in its negotiations. Parent's opening proposal contemplated paying holders of common units a 10% premium over market, represented by the closing price on the previous day. The agreement governing the MLP Merger paid holders of common units a 10.5% premium over market, calculated based on the closing price on the day preceding the announcement. Much of the background to the MLP Merger describes the Committee and its advisors' attention to provisions of the merger agreement focused on deal certainty and third party bids. Yet the Committee was not authorized to consider transactions involving third parties. And because Parent was not a seller and controlled both the General Partner and the GP Delegate, those provisions, and consequently the time spent discussing them, were unlikely to have much real-world consequence. The Committee did not obtain what the plaintiffs regard as the most important provision: a majority-of-the-minority vote. From the description of the Background of the Merger, it appears that the committee that considered the El Paso Merger was considerably more active and focused more meaningfully on terms with real-world consequence, like the consideration offered to the common unitholders.

Fourth, the Complaint alleges that the Committee failed to account for the value of a derivative claim when evaluating the MLP Merger. Notably, although the claim is styled as derivative, it alleges a breach of the LP Agreement. The individual common

8

unitholders are parties to that agreement. Perhaps recognizing that fact, the defendants in that litigation withdrew a motion to dismiss for lack of standing based on the closing of the MLP Merger. The Committee could have chosen to seek value for that claim during the negotiation of the MLP Merger. Instead, they opted to leave the claim for the limited partners to litigate directly. While this matter was under consideration the litigation resulted in a settlement agreement which, if approved, will yield a common fund of $27.5 million. Given the pending settlement, this aspect of the Complaint need not be considered further.

The Complaint alleges that taken together, these allegations support a reasonably conceivable inference that the Committee did not act in good faith. If the Committee had acted in good faith, the Committee would have refused to approve the MLP Merger, insisted on a different transaction structure, extracted greater consideration for the holders of common units, or at least extracted greater consideration relative to what the GP Delegate stockholders received.

At the same time, however, the Complaint alleges at length that the Partnership faced such serious financial challenges that it had to engage in a merger or other strategic transaction. *See* Compl. ¶¶ 75-92. The Complaint embraces the view of an analyst that the Partnership was "a house of cards." *Id.* ¶ 88. The Complaint recognizes that the MLP Merger "resolve[d] the 'house of cards' concern." *Id.* ¶ 114.

## II.    LEGAL ANALYSIS

While Count I of the Complaint contends that the General Partner, the GP Delegate, and the members of the GP Board breached their express and implied

9

contractual obligations under the LP Agreement, "only a party to a contract may be sued for breach of that contract." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P. (Gotham III)*, 817 A.2d 160, 172 (Del. 2002). The General Partner is the only defendant that was a party to the LP Agreement and who owed the obligations that the plaintiffs seek to enforce. The individual defendants and Parent were parties to the LP Agreement in their capacities as holders of common units representing limited partner interests, but they did not owe the contractual obligations that the Complaint seeks to enforce. On that basis, Count I is dismissed as to the defendants other than the General Partner.

Under the substantive terms of the LP Agreement, Count I is dismissed as to the General Partner as well. The Delaware Revised Uniform Limited Partnership Act gives "maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." *Norton v. K–Sea Transportation Partners, L.P.*, 67 A.3d 354, 360 (Del. 2013) (quoting 6 *Del. C.* § 17-1101(c)). "Parties may expand, restrict, or eliminate any fiduciary duties that a partner or other person might otherwise owe, but they 'may not eliminate the implied contractual covenant of good faith and fair dealing.'" *Id.* (quoting 6 *Del. C.* § 17-1101(d)).

The pertinent provisions of the LP Agreement are identical to those interpreted by the Delaware Supreme Court in *Norton*; the only distinction is that the provisions of the limited partnership agreement in *Norton* appeared in Article VII, while the provisions of the LP Agreement appear in Article VI. The Delaware Supreme Court's construction of those provisions is controlling.

Section 6.10(d) of the LP Agreement states:

10

Any standard of care[,] any duty imposed by this Agreement or under the Delaware Act or any applicable law, rule or regulation shall be modified, waived or limited as required to permit the General Partner to act under this Agreement or any other agreement contemplated by this Agreement and to make any decision pursuant to the authority prescribed in this Agreement *so long as such action is reasonably believed by the General Partner to be in, or not inconsistent with, the best interests of the Partnership.*

LPA § 6.10(d) (emphasis added). As interpreted by *Norton*, Section 6.10(d) eliminates all common law fiduciary duties and substitutes in their place a contractual duty under which the General Partner "must reasonably believe that its action is in the best interest of, or not inconsistent with, the best interests of the Partnership." 67 A.3d at 362. The provision establishes "a free-standing, enigmatic standard of good faith" which requires "a reasonable belief" on the part of the General Partner. *Id.* (internal quotation marks omitted). The LP Agreement's "addition of the term 'reasonably' distinguishes it from limited partnership agreements that Delaware courts have interpreted as establishing a purely subjective good faith standard." *Id.* at 361 n.34. If the LP Agreement had not eliminated fiduciary duties, and if the plaintiffs had plead a claim for breach of fiduciary duty (as they doubtless would have), then I would have held that the complaint stated a claim for breach under the Rule 12(b)(6) standard. Under *Norton*, however, the analysis is solely contractual.[1]

---

[1] Absent *Norton*, I would hold that the plain language of Section 6.10(d) establishes a condition precedent to the effectiveness of the provisions of the LP Agreement that purport to modify, waive, or limit standards of care or duties otherwise imposed by law. Section 6.10(d) states that "so long as" the General Partner has the requisite belief, then those other provisions will operate to modify, waive, or limit the otherwise applicable standards of care or duties. The necessary belief has two parts: The General Partner must actually believe that the action taken was "in, or not inconsistent with, the best interests of the Partnership," and the General Partner's subjective belief must be objectively reasonable ("reasonably believed"). As a condition

11

Section 6.9(a) of the LP Agreement states:

Unless otherwise expressly provided in this Agreement, . . . whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, . . . and Partner or any Assignee, on the other hand, any resolution or course of action in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, . . . or of any duty stated or implied by law or equity, if the resolution or course of action is or, by operation of this Agreement is deemed to be, fair and reasonable to the Partnership.The General Partner shall be authorized but not required in connection with its resolution of such conflict of interest to seek Special Approval of a resolution of such conflict or course of action.

*Any conflict of interest and any resolution of such conflict of interest shall be conclusively deemed fair and reasonable to the Partnership if such conflict of interest or resolution is (i) approved by Special Approval,* (ii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iii) fair to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership). . . .

---

precedent, Section 6.10(d) does not itself impose any contractual obligations. This is reflected by the absence of any language in the provision imposing any obligation on the General Partner. Because it is a condition precedent, the General Partner's failure to comply with Section 6.10(d) does not itself give rise to a breach of the LP Agreement. It rather constitutes the failure of a condition. In my view, the result of that failure would be that to the extent a provision of the LP Agreement otherwise would modify, waive, or limit the General Partner's duties or obligations so as to make them purely contractual, that provision no longer would have that effect. Under those circumstances, the consequence would be that the specific contractual obligation would still exist, but that the contractual obligation would not be effective to modify, waive, or limit the General Partner's duties or obligations so as to make them purely contractual. Common law duties, including fiduciary duties, would apply in addition to the contractual obligation. As in other settings involving the behavior of fiduciaries, the familiar "twice-tested" rubric would come into play. *See generally* A. A. Berle, Jr., *Corporate Powers As Powers In Trust*, 44 Harv. L. Rev. 1049, 1049 (1931). The General Partner would have to satisfy both the legal test (as established by the terms of the LP Agreement) as well as the equitable test (fiduciary duty review). This opinion could have devoted many pages to developing this interpretation further and exploring its interrelationship with other cases in the limited partnership canon. But *Norton* is controlling, and the endpoint for this case is largely the same in any event. *See infra* note 3.

The General Partner (including the [Committee] in connection with Special Approval) shall be authorized in connection with its determination of what is "fair and reasonable" to the Partnership and in connection with its resolution of any conflict of interest to consider (A) *the relative interests of any party to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interest*; (B) any customary or accepted industry practices and any customary or historical dealings with a particular Person; (C) any applicable generally accepted accounting or engineering practices or principles; and (D) *such additional factors as the General Partner (including such [Committee]) determines in its sole discretion to be relevant, reasonable or appropriate under the circumstances*.

LPA § 6.9(a) (formatting and emphasis added). In *Norton*, the Delaware Supreme Court interpreted this provision to operate as permissive contractual safe harbor. 67 A.3d at 364. As interpreted by *Norton*, the General Partner is not obligated to comply with Section 6.9(a); it has the choice whether or not to do so.[2]

---

[2] Absent *Norton*, I would hold that Section 6.9(a) is a specific contractual standard of review for conflict transactions that applies "whenever a potential conflict of interest exists or arises" and which the General Partner must satisfy if it wishes to avoid having the transaction also reviewed under the common law, including for compliance with fiduciary duties. It is true, as *Norton* observes, that Section 6.9(a) does not require that the General Partner seek Special Approval. 67 A.3d at 362. But that is because there are other ways to satisfy Section 6.9(a), either because the transaction itself is "fair and reasonable" or because it is "deemed fair and reasonable" via one of three contractual alternatives, with Special Approval being one of the three. I would hold that as the more specific standard for conflict transactions, Section 6.9(a) takes precedence over the general standard for mergers found in Section 16.2, just as the more specific entire fairness standard governs an interested merger at common law in lieu of the default standard of business judgment review.

There are other sections in Article VI that address still more specific types of conflict transactions. *See, e.g.*, LPA § 6.4 (reimbursement of the General Partner's expenses); *id.* at § 6.5 (outside activities and ability to compete); *id.* at § 6.6 (loans to and from the General Partner and contracts with its affiliates); *id.* at § 6.7 (advancement and indemnification). If the General Partner engaged in one of those more specific types of conflict transactions, then Section 6.9(a) would yield to the pertinent section. In my view, those more specific sections and standards (such as the test cited in *Norton* for transactions involving the property of the Partnership) do not negate Section 6.9(a)'s role in policing conflict transactions. They rather show a hierarchy of provisions in which the progressively more specific section controls at each stage. If the issue

As *Norton* read Sections 6.9(a) and 6.10(d), they combine to mean that if the General Partner seeks Special Approval, then the Committee must believe (i) subjectively that the action taken was on terms "fair and reasonable" to the Partnership (LPA § 6.9(a)) and (ii) both subjectively and reasonably that the action taken was "in the best interests of, or not inconsistent with, the best interests of the Partnership" (LPA § 6.10(d)).[3] Importantly, the operative tests focus on the Partnership, *viz.*, whether the MLP Merger was (i) in the best interests *of the Partnership* and (ii) fair and reasonable *to the Partnership*. Under Section 6.9(a), when making its determination, the Committee is "entitled to consider only such interests and factors as it desires and shall have no duty or

---

had not been decided by *Norton*, I would hold that Special Approval is an optional safe harbor within Section 6.9(a), but that some form of compliance with Section 6.9(a) is required, unless the nature of the transaction implicated an even more specific provision.

[3] As a practical matter, this result is quite close to where I would arrive (albeit by a different road) absent *Norton*. I would get there as follows: If the General Partner wishes to have a purely contractual regime apply to the decision to enter into the MLP Merger, then the General Partner must meet the contractual condition precedent in Section 6.10(d), which requires an objectively reasonable belief that the action taken is in (or not inconsistent with) the best interests of the Partnership. Once that threshold requirement is met, then because the MLP Merger is a conflict transaction that the LP Agreement does not address more specifically elsewhere, the General Partner must comply in some form with Section 6.9(a). In this case, the General Partner chose to do so by Special Approval, so the requirements of that otherwise optional safe harbor apply. The extensive verbiage in Section 6.9(a) about what the Committee can consider reduces to a requirement that the Committee members have believed in subjective good faith that the terms of the MLP Merger were fair and reasonable to the Partnership.

Given my ruling on the motion to dismiss, there is no substantive difference between the competing approaches for purposes of this case. There could be differences in other settings. For example, if the General Partner does not satisfy the requirements of Section 6.10(d), then under *Norton*, that is a contractual breach. *See* 67 A.3d at 360-61. Under my reading, it is not a breach, only a failure of a condition that results in the application of default fiduciary duties. There are other potential differences as well that could play out in various scenarios, but because *Norton* is controlling, and because there is no difference in the outcomes here, this decision will spare the reader from further discussion of those possibilities.

obligation to given any consideration to any interest of, or factors affecting, the Partnership, . . . any Limited Partner or any Assignee . . . ." LPA § 6.9(b)(i). In *Norton*, the Delaware Supreme Court recognized that such a provision does not require the Committee to determine whether merger consideration is fair to the limited partners, but "only whether the Merger as a whole was in the best interests of the Partnership (which included the general partner and the limited partners)." 67 A.3d at 367. Interpreting a similar provision as a Vice Chancellor, Chief Justice Strine wrote:

> Does § 6.11(b) mean that a General Partner may act in a "conflict" situation under a standard by which it need not—*as a contractual matter*—consider the interests of the limited partners? I conclude so. However harsh it may sound, this is in fact the only reasonable reading of the Agreement. By its terms, § 6.11(b) indicates that other contractual standards—such as those contained in § 6.11(a)—give way and are of no force and effect when the Agreement subjects certain action of the General Partner to an "express" sole and complete discretion standard.

*Gelfman v. Weeden Invs., L.P.*, 792 A.2d 977, 986 (Del. Ch. 2001) (Strine, V.C.) (emphasis in original); *accord Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 180-81 (Del. Ch. 2014), *aff'd*, __ A.3d ___ (Del. 2015) (ORDER).

Other than contending that the allegations of the Complaint support an inference that the members of the Committee lacked the requisite mental state, the plaintiffs have not identified a violation of the contractual requirements for Special Approval. They do not contend, for example, that the members of the Committee did not meet the minimal requirements specified in the LP Agreement.

If the applicable standard required that the members of the Committee determine that the MLP Merger was in the best interests of the limited partners, then the

Complaint's allegations would support a pleading-stage inference that that the members of the Committee did not act in good faith. It is reasonably conceivable, based on the facts alleged, that the members of the Committee approved the terms of the MLP Merger to accommodate Parent, rather than because they believed they were in the best interests of the limited partners. Although poor negotiating alone is not enough,[4] that factor can combine with others to support the requisite inference.[5] In this case, the factors include a pattern of concessions, a blind-eye towards contradictory market evidence, the transfer of significant value in the form of tax benefits from the limited partners to the controller, and substantial opposition from disinterested unitholders. That is not the only inference, nor necessarily the better inference, but it is reasonably conceivable, making it possible that the plaintiffs could establish a set of facts after taking discovery on which they could

[4] *See Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104-06 (Del. 2013) (holding that allegations that a conflicts committee may have negotiated poorly did not suggest an inference of subjective bad faith); *Brinckerhoff v. Enbridge Energy Co.*, 2011 WL 4599654, at *10 (Del. Ch. Sept. 30, 2011) (dismissing claim that conflicts committee acted in bad faith where committee met with financial and legal advisors to consider transaction), *aff'd*, 67 A.3d 369 (Del. 2013); *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *14 (Del. Ch. Oct. 28, 2010) (dismissing cause of action against directors and officers where the complaint alleged that members of the conflicts committee "failed even to look at all of its options or to negotiate the best deal available" and holding that such allegations "[did] not suggest the type of subjective bad faith required to state a claim under the duty imposed by [a Special Approval provision]").

[5] *See Brinckerhoff v. Tex. E. Prodt.s Pipeline Co., LLC ("TEPPCO")*, 986 A.2d 370, 390 (Del. Ch. 2010) (discussing claim for violation of Special Approval provision where facts suggested inference of bad faith); *Gelfman*, 792 A.2d at 990 (citing factors which, in combination, supported inference of bad faith on the part of general partner); *see also Brinkerhoff v. El Paso Pipeline GP Co.,* C.A. No. 7141-CS (Del. Ch. Oct. 26, 2012) (Strine, C.) (TRANSCRIPT) (denying motion to dismiss that relied on Special Approval provision; holding that allegations supported pleading-stage inference that Committee had not acted in good faith); Bruce L. Silverstein, Kathaleen St. J. McCormick, & Tammy L. Mercer, *Key Decisions of 2012 in Delaware Corporate and Alternative Entity Law*, 14 Del. L. Rev. 1, 24-25 (2013) (discussing then-Chancellor Strine's transcript ruling in *Brinkerhoff v. El Paso*).

prevail at trial. *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846 (Del. Ch. Apr. 20, 2015) (granting judgment after trial in favor of plaintiff where evidence, contrary to the court's expectations, established that the members of a Conflicts Committee did not grant Special Approval in good faith).

But the members of the Committee did not have to believe that the MLP Merger was in the best interests of the limited partners. They rather had to believe in good faith that the MLP Merger was in the best interests of the Partnership. The Complaint's allegations do not provide a basis to question the Committee's decision from the standpoint of the Partnership. Indeed, if the Complaint's allegations are credited, the Partnership faced a looming crisis because of its increasing cost of capital. *See* Compl. ¶¶ 75-92. The inference that the Complaint's allegations actually support is that the Committee acted reasonably and in the best interests of the Partnership by agreeing to the MLP Merger and solving the Partnership's cost-of-capital conundrum.

In their brief but not in the Complaint, the plaintiffs contended that even if the Committee was only required to consider the interests of the Partnership, they voluntarily undertook a duty to act in the best interests of the limited partners. As support, the plaintiffs cited *In re Cencom Cable Income Partners, L.P. Litigation (Cencom I)*, 1997 WL 666970 (Del. Ch. Oct. 15, 1997). There, the general partner disclosed that it had hired a law firm to represent the interests of the limited partners, telling investors, among other things, that the firm would deliver an opinion that the transaction was consummated in compliance with the partnership agreement (even though the partnership agreement included no such requirement). *Id.* at *5. The plaintiffs argued that the general partner

17

breached a voluntarily-assumed duty by failing to ensure that the law firm had in fact undertaken the tasks described in the disclosure statement. *Id.* The Court of Chancery denied the defendants' motion for summary judgment. *Id.* at *6.

A later decision in the *Cencom* litigation makers clear that *Cencom I* is more properly viewed as a decision about the duty of disclosure.[6] The Complaint does not assert a claim regarding the accuracy of the disclosures.[7] For present purposes, *Cencom I* does not provide grounds to alter the contractual standard that the Committee had to meet.

The General Partner thus did not breach any express term of the LP Agreement. The Complaint also argues that the General Partner breached the LP Agreement's implied terms. The plaintiff correctly contends that the implied covenant constrains the Special Approval process. *See TEPPCO*, 986 A.2d at 390. To plead a claim for breach, the plaintiffs must allege facts suggesting "from what was expressly agreed upon that the

---

[6] *In re Cencom Cable Income P'rs, L.P. Litig.*, 2000 WL 640676, at *4 (Del. Ch. May 5, 2000) ("I can not comfortably determine whether any representation or omission in the Disclosure Statement . . . constitutes an actionable breach *of the duty of candor* without a trial on the merits.") (emphasis added); *id.* at *3 (noting that "[p]laintiffs also claim that the Disclosure Statement 'materially' misled the Limited Partners into voting for the Sale Transaction under the mistaken belief that [the lawyer] would assure them of both the fairness of the appraisal process as well as the terms of the Sale Transaction.") (emphasis omitted); *accord Sonet v. Timber Co.*, 722 A.2d 319, 326-27 (Del. Ch. 1998) (refusing to find that general partner imported fiduciary duties into its contractual relationship with the unitholders, stating "[p]laintiff's asserted theory of voluntary assumption of common law fiduciary duties [relying "heavily" on *Cencom I*] is actually a *potential* disclosure claim. As such, it is not ripe and must be dismissed.").

[7] The Complaint did identify purported deficiencies in the description of the financial advisor's analysis, but only as evidence of the Committee's bad faith. Compl. ¶¶ 128-31. Even if analyzed as a claim for breach of the fiduciary duty of disclosure, those objections would not state a claim.

parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.).

The Complaint's principal theory is that the General Partner breached the implied covenant by appointing conflicted individuals to serve on the Committee. As a general matter, the evident purpose of the Special Approval process is to establish a mechanism for review by independent and disinterested individuals. Some conflicts could rise to a level where it would be clear that had the parties thought to address the issue at the time of contracting, they would have precluded individuals with those conflicts from serving on a committee that would provide Special Approval. Such a claim seems particularly viable where the limited partnership agreement has been drafted unilaterally by the general partner and hence might be expected to be parsimonious in identifying disqualifying attributes.[8]

The Complaint first alleges the existence of a conflict because the members of the Committee were also directors of the General Partner. That inherent structural conflict is insufficient to undermine a Special Approval determination. *Brickell P'rs v. Wise*, 794 A.2d 1, 4 (Del. Ch. 2001) (Strine, V.C.).

---

[8] *Cf. Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P. (Gotham I)*, 2000 WL 1476663, at *8 (Del. Ch. Sept. 27, 2000) (Strine, V.C.) ("Where a limited partnership agreement was drafted exclusively by the general partner, the court will interpret ambiguities against the drafter . . . ."); *accord Norton*, 67 A.2d at 360; *In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.*, 810 A.2d 351, 355, 361 (Del. Ch. 2002) (Strine, V.C.).

The Complaint alternatively alleges that a conflict existed because the members of the Committee were simultaneously serving on the Delegate Committee. *See* Compl. ¶ 116. Although it would have been better to have two separate committees with separate advisors, the Complaint's allegations are insufficient to implicate the implied covenant. Gardner, Hultquist, and Waughtal did not face a direct conflict where they were negotiating against an entity to which they also owed duties, as would have been true if they were also fiduciaries of Parent.[9] The interests of the GP Delegate and the Partnership were aligned in getting the most consideration possible from Parent. The question was the allocation of that consideration.

At common law, "the decision to allocate different consideration is a discretionary, fiduciary determination that must pass muster under the appropriate standard of review . . . ." *In re Trados S'holder Litig. (Trados II)*, 73 A.3d 17, 40 (Del.

---

[9] *See, e.g.*, *Krasner v. Moffett*, 826 A.2d 277, 283 (Del. 2003) ("[T]hree of the FSC directors . . . were interested in the MEC transaction because they served on the boards . . . of both MOXY and FSC."); *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) ("The ARCO officers and designees on Chemical's board owed Chemical's minority shareholders 'an uncompromising duty of loyalty.' There is no dilution of that obligation in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of ARCO and as directors of Chemical." (footnotes omitted)); *Rabkin v. Philip A. Hunt Corp.*, 498 A.2d 1099, 1106 (Del. 1985) (holding that parent corporation's directors on subsidiary board faced conflict of interest); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, *8 (Del. Ch. July 24, 2009) (treating directors who were affiliated with preferred stockholders as interested for pleading purposes when "each had an ownership or employment relationship with an entity that owned Trados preferred stock"); *see also Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *3 (Del. Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, are both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the . . . [l]oan."); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987) (same).

Ch. 2013). When disinterested, independent directors make the allocation, the business judgment rule applies.[10] If conflicted fiduciaries make the determination, entire fairness typically applies.[11]

In this case, the issue arises under the implied covenant. The fiduciary duty backdrop informs the implied covenant analysis because it suggests that in the hypothetical original bargaining position, the prospect of having three disinterested, independent decision-makers allocate consideration between two competing constituencies would not be regarded as objectionable. Further support for that conclusion lies in the degree of structural conflict that directors of a corporate general partner always face as directors of the corporation and decision makers for the limited partnership. Limited partners accept that inherent conflict with the understanding that the disinterested and independent directors of the corporate general partner will make

---

[10] *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 950-51 (Del. Ch. 2001) (Strine, V.C.); *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617-18 (Del. Ch. 1999) (Strine, V.C.); *Solomon v. Armstrong*, 747 A.2d 1098, 1117-18 (Del. Ch. 1999).

[11] *Trados II*, 73 A.3d at 51-52 (Del. Ch. 2013) (applying entire fairness standard after trial where directors facing a conflict of interest pursued a transaction to trigger their liquidation preference); *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *12 n.57 (Del. Ch. Mar. 6, 2012) (finding reasonable probability of success on challenge to transaction in which controlling stockholder was allocated greater merger consideration); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) (denying motion to dismiss challenge to transaction in which controller allegedly received differential consideration); *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *7 (Del. Ch. Dec. 21, 2005) (denying summary judgment where merger conferred "a clear and significant benefit of nearly $300 million accrued primarily" to directors holding high-vote common stock (footnote omitted)); *In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 178 (Del. Ch. 2005) (denying motion to dismiss common stockholders' challenge to transaction in which corporation was sold to third party but controlling stockholder received right to roll over his equity).

allocation decisions. *See Gotham I*, 2000 WL 1476663, at *22 (explaining that limited partnership agreement contemplated that non-management directors of corporate general partner "would be the ones entrusted with balancing the interests of the corporate general partner and its affiliates against the interests of the other unitholders"). The acceptance of that structural conflict suggests that, in the hypothetical original bargaining situation, the parties would not have precluded otherwise independent and disinterested directors of the GP Delegate from serving on the Committee.

The plaintiffs have not otherwise identified a conflict that would support an implied covenant claim. They point out that Gardner owned 1.8 times more shares of the GP Delegate than common units of the Partnership, and that Waughtal owned twice as many shares than common units. The Complaint alleges:

> At the time they approved the [MLP Merger] Agreement, Gardner's combined holdings of [the Partnership, the GP Delegate, and Parent] totaled $23,335,382, of which [common units] only accounted for 15%. Likewise, Waughtal's combined holdings of [the Partnership, the GP Delegate, and Parent] totaled $11,525,976, of which [common units] only accounted for 33%.

Compl. ¶ 141. "[T]he degree to which directors own different classes or series of stock may affect the standard of review" that governs an allocation decision, but the divergence in ownership must be sufficiently material to create a conflict.[12]

---

[12] *Trados II*, 73 A.3d at 40. *Compare Tele–Commc'ns,* 2005 WL 3642727, at *7 (considering directors' relative ownership of high-vote and low-vote stock and drawing inference of conflict from disproportionate ownership of high-vote shares), *with Staples*, 792 A.2d at 949-51 (considering directors' ownership of tracking stock in evaluating interestedness and applying business judgment rule because the directors' ownership stakes did not give rise to a material conflict), *and Gen. Motors Class H*, 734 A.2d at 617-18 (same), *and Solomon*, 747 A.2d at 1117-18 (same).

It is incumbent upon a plaintiff to explain how the allegations of ownership give rise to a conflict. From the allegation quoted above, it is clear that Gardner and Waughtal owned a larger financial stake in Parent and the GP Delegate together than they did in the Partnership. But that is not a helpful comparison. As Parent presented it, the negotiation was between Parent, on the one side, and the GP Delegate and the Partnership on the other. The Complaint does not explain how taking an additional dollar of consideration from Parent would affect Gardner and Waughtal. As the Complaint frames it, the negotiation should have been more complex, with the Partnership also bargaining for consideration from the GP Delegate. It seems that Gardner and Waughtal did marginally better by having the shares of the GP Delegate receive equal consideration rather than lesser consideration, but it is not clear by how much or whether that amount should be regarded on a motion to dismiss as material to them. From the disclosures in the proxy statement, the court could try to work out the math independently, but it is the plaintiff's job to plead these matters, even under a Rule 12(b)(6) standard.

The Complaint has not identified a conflict faced by the members of the Committee sufficient to implicate the implied covenant of good faith and fair dealing. Because the Committee members did not face a conflict, the General Partner did not breach the implied covenant when the Committee members hired a single set of advisors. The Complaint has not identified other connections or affiliations on the advisors' part which, in the aggregate, could prove problematic.

Count I is therefore dismissed for failure to state a claim on which relief can be granted. Counts II and III seek to impose secondary liability on Parent, the GP Delegate,

23

the Partnership, the subsidiary that merged with the Partnership, and the individual defendants for the underlying wrongs asserted in Count I. Because Count I has been dismissed, Counts II and III are dismissed also.