# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ADRIAN DIECKMAN, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 11130-CB |
| REGENCY GP LP, REGENCY GP LLC, ENERGY TRANSFER EQUITY, L.P., ENERGY TRANSFER PARTNERS, L.P., ENERGY TRANSFER PARTNERS, GP, L.P., MICHAEL J. BRADLEY, JAMES W. BRYANT, RODNEY L. GRAY, JOHN W. McREYNOLDS, MATTHEW S. RAMSEY and RICHARD BRANNON, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  December 10, 2015
Date Decided:  March 29, 2016

Jay W. Eisenhofer and James J. Sabella, GRANT & EISENHOFER P.A., Wilmington, Delaware; Mark Lebovitch, Jeroen van Kwawegen and Alla Zayenchik, BERNSTEIN LITOWITZ  BERGER & GROSSMANN LLP, New York, New York; Mark C. Gardy and James S. Notis, GARDY & NOTIS, LLP, New York, New York; *Attorneys for Plaintiff Adrian Dieckman*.

Rolin P. Bissell and Tammy L. Mercer, YOUNG CONAWAY STARGATT  & TAYLOR, LLP, Wilmington, Delaware; Michael Holmes, Manuel Berrelez, Elizabeth Brandon and Craig Zieminski, VINSON & ELKINS LLP, Dallas, Texas;

*Attorneys for Defendants Regency GP LP, Regency GP LLC, Energy Transfer Equity, L.P., Energy Transfer Partners, L.P., Energy Transfer Partners, GP, L.P., Michael J. Bradley, Rodney L. Gray, John W. McReynolds and Matthew S. Ramsey.*

David J. Teklits and D. McKinley Measley, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; M. Scott Barnard, Michelle A. Reed and Matthew V. Lloyd, AKIN GUMP STRAUSS HAUER & FELD LLP, Dallas, Texas; *Attorneys for Defendants James W. Bryant and Richard Brannon.*

**BOUCHARD, C.**

This action involves the acquisition of Regency Energy Partners LP by an affiliated entity for approximately $11 billion in a unit-for-unit merger that closed in April 2015. Plaintiff is a former unitholder of Regency. His primary claim is that Regency's general partner favored the interests of its affiliates to the detriment of Regency's unaffiliated unitholders in agreeing to an unfair merger price and thus breached the contractual requirement in the limited partnership agreement that the general partner act in good faith.

Critical to this case, the Regency limited partnership agreement eliminated all fiduciary duties and replaced them with a contractual governance scheme. That scheme includes a series of safe harbors to address potentially conflicted transactions. One of the safe harbors is triggered when a potentially conflicted transaction is approved by a conflicts committee. Another is triggered if a potentially conflicted transaction is approved by a majority of the unaffiliated common units. The limited partnership agreement provides that, if any of these safe harbors is satisfied, a potentially conflicted transaction shall be deemed to have been approved by all of the limited partners and shall not constitute a breach of the agreement or of any duty stated or implied in law or equity.

Defendants moved to dismiss the complaint for failure to state a claim for relief. They argue that the merger is shielded from judicial review by operation of the safe harbors involving the use of a conflicts committee and the approval by the

1

unaffiliated unitholders. As to the latter, it is undisputed that the merger was approved by approximately 60% of the unaffiliated common units outstanding and over 99% of the unaffiliated common units that were voted. Plaintiff counters that the conflicts committee itself was conflicted, that those conflicts were not adequately disclosed to Regency's unitholders, and that the unitholder approval safe harbor was ineffective because it could not be invoked by an uninformed vote.

By eliminating all fiduciary duties, Regency's limited partnership agreement extinguished the common law duty of disclosure that exists under Delaware law. The only disclosure obligation in the agreement is that a copy or summary of the merger agreement must be provided to unitholders before they vote on a transaction. In light of this scheme and the explicit elimination of fiduciary duties, the unitholder approval safe harbor cannot be read to require additional disclosures. Plaintiff's argument that the unitholder approval safe harbor was ineffective is thus unavailing. Even the implied covenant of good faith and fair dealing will not create additional disclosure obligations when the parties' contractual arrangement extinguishes the duty of disclosure and replaces it with an explicitly delineated alternate system. For these reasons and others explained below, Regency's limited partnership agreement precludes judicial review of the merger under Delaware law, requiring dismissal of plaintiff's complaint.

## I.    BACKGROUND

The facts recited in this opinion are based on the allegations of plaintiff's Verified Class Action Complaint (the "Complaint"), the Amended and Restated Agreement of Limited Partnership of Regency Energy Partners LP (the "LP Agreement"), which is integral to the Complaint, and the undisputed results of the unitholder vote on the challenged transaction.

### A.    The Parties

At the heart of this case is Regency Energy Partners LP ("Regency"), a Delaware limited partnership that was publicly traded until April 30, 2015. Regency is in the business of gathering, processing, compressing, treating, and transporting natural gas. Plaintiff Adrian Dieckman was a common unitholder of Regency at all times relevant to this litigation.

Defendant Regency GP LP is a Delaware limited partnership that served as the general partner of Regency. Defendant Regency GP LLC is a Delaware LLC that in turn served as the general partner of Regency GP LP. For simplicity, I refer to these entities interchangeably as the "General Partner," although most of the decision-making relevant to this case occurred at the Regency GP LLC level.

Defendant Energy Transfer Partners L.P. ("ETP") is a Delaware limited partnership that owns the general partner of Sunoco LP ("Sunoco"), 43% of the limited partnership interests in Sunoco, and 100% of Sunoco's distribution rights.

3

ETP acquired Regency's common units on April 30, 2015. Defendant Energy Transfer Partners, GP, L.P. ("EGP") is a Delaware limited partnership that serves as the general partner of ETP.

Sitting atop this structure is defendant Energy Transfer Equity, L.P. ("ETE"), a Delaware limited partnership. ETE indirectly owns the General Partner of Regency and the general partner of ETP (EGP). ETE thus controlled Regency both before and after ETP acquired Regency in a merger (the "Merger"). The ownership relationships among the relevant entities before the Merger are depicted below, along with the status of Regency after the Merger:



4

The Complaint also names as defendants the six members of the General Partner's board of directors: Michael J. Bradley (also CEO of the General Partner), James W. Bryant, Rodney L. Gray, John W. McReynolds (also CFO and President of ETE), Matthew S. Ramsey, and Richard Brannon. Bryant and Brannon served on the Conflicts Committee of the General Partner's board. Brannon served as a Sunoco director until January 20, 2015, and was reappointed to the Sunoco board on May 5, 2015. Bryant also was appointed to Sunoco's board on May 5, 2015.

## B. The LP Agreement

The LP Agreement governs the General Partner's relationship with Regency's limited partners. Section 7.9(b) of the LP Agreement provides that whenever the General Partner makes a determination or takes action in its capacity as Regency's general partner, it must do so in good faith, which is defined to mean that the persons making such a determination or taking such action "must believe that the determination or other action is in the best interests of the Partnership."[1] Insofar as conflicted transactions are concerned, the LP Agreement further provides that an action of the General Partner "shall not constitute a breach" of the LP Agreement "or of any duty stated or implied by law or equity." The four safe harbors are set forth below, with the two relevant to this action in bold:

---

[1] Zieminski Aff. Ex. 1 (LP Agreement) § 7.9(b).

5

(a) Unless otherwise expressly provided in this Agreement . . ., whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, any Group Member or any Partner, on the other, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is *(i) approved by Special Approval, (ii) approved by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates)*, (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties <u>or</u> (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).[2]

The LP Agreement defines Special Approval as "approval by a majority of the members of the Conflicts Committee."[3] The Conflicts Committee is defined as:

[A] committee of the Board of Directors of the general partner of the General Partner [Regency GP LLC] composed entirely of two or more directors who are not (a) security holders, officers or employees of the General Partner, (b) officers, directors or employees of any Affiliate of the General Partner or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of

---

[2] *Id.* § 7.9(a) (emphasis added). The term "General Partner" is defined to mean Regency GP LP, the immediate general partner of Regency. *Id.* § 1.1, at A-6. As noted above, for purposes of simplicity, I define the term "General Partner" in this opinion to include both Regency GP LP and its general partner, Regency GP LLC.

[3] *Id.* § 1.1, at A-13.

the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading.[4]

An "Affiliate" is defined to mean "with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person in question."[5]

In simple terms, the first safe harbor, Section 7.9(a)(i), shields a conflicted transaction from challenge if the transaction is approved by a conflicts committee consisting of at least two directors, none of whom are officers, directors, employees or security holders of the General Partner or any entity controlling, controlled by, or under common control with the General Partner. I refer to this provision as the "Special Approval" safe harbor.

The second safe harbor, Section 7.9(a)(ii), shields a transaction if it is approved by a majority of the units not held by the General Partner or by any entity controlling, controlled by, or under common control with it. I refer to this provision as the "Unitholder Approval" safe harbor.

In addition to the four safe harbors enumerated in Section 7.9(a) of the LP Agreement, Section 7.10(b) provides a conclusive presumption of good faith when the General Partner acts in reliance on legal or financial advisers:

---

[4] *Id.* § 1.1, at A-5.

[5] *Id.* § 1.1, at A-2.

The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the opinion (including an Opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.[6]

## C.  The Merger of Regency and ETP

From 2013 into 2015, Regency exhibited strong financial performance featuring robust EBITDA and cash flow growth despite a softening oil and gas market.  On January 16, 2015, in the midst of this strong performance, the boards of ETP and ETE met to discuss the idea of merging ETP and Regency.  The ETP board approved making a proposal to purchase Regency.  Executives of the General Partner, ETP, and ETE met the same day to discuss ETP's offer.  The General Partner's board determined that it would authorize the Conflicts Committee to review the transaction and subject the transaction to the Committee's approval.

On January 16, 2015, Brannon was appointed to the General Partner's board. On January 19, Brannon and Bryant discussed the proposed transaction with Bradley and Thomas Long, the Chief Financial Officer of the General Partner.  At

---

[6] *Id.* § 7.10(b).

this time, Brannon was still serving on Sunoco's board and had not been appointed to the Conflicts Committee.

On January 20, 2015, Brannon resigned from Sunoco's board and was appointed to the Conflicts Committee. That same day, Brannon and Bryant had a call with their counsel to confirm their appointment to the Committee. On January 22, the General Partner's board formally delegated to the Conflicts Committee the authority to review the proposed transaction.

On January 25, 2015, just five days after Brannon joined the Conflicts Committee and just three days after the Conflicts Committee received its formal delegation of authority regarding the proposed transaction, the Conflicts Committee and ETP completed their negotiations and reached an agreement to merge, which the General Partner's board approved the same day. ETP was to buy Regency for 0.4066 units of ETP and $0.32 in cash per share of Regency, which was later amended to replace the cash component with additional ETP units. On January 26, 2015, Regency and ETP publicly announced the proposed Merger. On March 24, 2015, a 165-page definitive proxy statement on Schedule 14A (the "Proxy") was disseminated to Regency's unitholders along with a copy of the merger agreement.

At a special meeting held on April 28, 2015, Regency's unitholders approved the Merger. As of the record date for the meeting, Regency had

9

419,130,009 units outstanding that were entitled to vote, of which 94,804,258 units or 22.62% were affiliated (*i.e.*, held by Regency's directors, officers, or their affiliates, including ETE and ETP) and 324,325,751 or 77.38% were unaffiliated.[7] At the meeting, 288,192,799 units voted in favor of the transaction, representing 99.57% of units present at the meeting and 68.76% of total units outstanding.[8] Of the unaffiliated units, a minimum of 193,388,541 units voted in favor of the Merger, representing at least 99.37% of the unaffiliated units present at the meeting and at least 59.63% of the total unaffiliated units outstanding.[9] I say these

---

[7] *See* Proxy at 46; Current Report on Form 8-K, Regency Energy Partners LP (Apr. 28, 2015) (the "8-K") at 2. The different types of units (common, Class F, and Series A convertible preferred) are consolidated in this analysis because they all were entitled to vote at the special meeting. *Id.*

[8] 8-K at 2.

[9] *Id.* at 2. Although the Complaint acknowledges that the unitholders approved the Merger, Compl. ¶ 35, it is necessary to refer to two securities filings outside of the Complaint to determine whether the Merger was approved by a majority of unaffiliated units in order to satisfy the Unitholder Approval safe harbor. First is the Proxy, which provides the number of affiliated units. Plaintiff agreed that the Court may consider the Proxy on this motion because both parties relied on information from it. Tr. Oral Arg. 119-20. Indeed, the Proxy is referenced throughout the Complaint and plaintiff's brief. *See* Compl. ¶¶ 10, 37, 53, 55, 56; Pl.'s Ans. Br. 10-11, 15-17, 23, 27, 50. Thus, I may consider the unitholder information from the Proxy on this motion. *See Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013) (holding that a proxy statement was properly considered because plaintiff had premised his factual allegations squarely on it); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999) ("[T]he court may consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint . . . ."), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE).

The second filing, Regency's April 28th 8-K, contains the results of the vote. Plaintiff similarly agreed that the Court may take judicial notice of what that document says

10

figures are "at least" because the figures presume that all affiliated units voted in favor of the transaction. The unaffiliated percentages would be higher if some of the affiliated units had in fact voted against the Merger. Thus, there is no question that a majority of unaffiliated units approved the transaction. The Merger closed on April 30, 2015.

## D.     The Texas Federal Action

On February 11, 2015, before commencing this litigation, plaintiff filed an action in the United States District Court for the Northern District of Texas and sought to enjoin the Merger.[10] The district court consolidated his suit with several others.

On April 1, 2015, plaintiffs in the federal action filed an emergency motion to expedite discovery in aid of disclosure claims for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder relating to a registration statement that had been filed with the United

---

concerning the vote. Tr. Oral Arg. 120-21. I do so because the 8-K is a public securities filing and the relevant figures are voting tabulations that are not subject to reasonable dispute. *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (taking judicial notice of SEC filings in order to compile stock trading statistics) ("[T]here is no risk of unfair prejudice or surprise here because defendants do not object to our considering the proffered forms."); *cf. Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 & n.28 (Del. 2004) (distinguishing between taking judicial notice of publicly filed documents required by law and taking judicial notice of other documents and news articles on a motion to dismiss).

[10] Verified Class Action Complaint, *Dieckman v. Regency Energy P'rs*, C.A. No. 3:15-CV-484 (N.D. Tex. Feb. 11, 2015).

States Securities and Exchange Commission in connection with the proposed Merger.[11] The district court denied this motion on April 18.[12] Plaintiff voluntarily dismissed his federal action on June 5, 2015, after he was not selected as interim co-lead plaintiff.[13]

### E. Procedural Posture

On June 10, 2015, plaintiff filed the Complaint in this case asserting four claims on behalf of a class of Regency common unitholders as of the date of the Merger:

- Count I asserts that the General Partner breached the express terms of the LP Agreement by failing to act in good faith when approving the Merger because it allegedly favored the interests of the General Partners' affiliates, and by appointing Bryant and Brannon to the Conflicts Committee despite their alleged ineligibility.

- Count II asserts that the General Partner breached the implied covenant of good faith and fair dealing in the LP Agreement by appointing Brannon and Bryant to the Conflicts Committee, even though Brannon was affiliated with

---

[11] Co-Lead Pls.' Emergency Mot. to Expedite Disc., *Bazini v. Bradley*, C.A. No. 3:15-CV-389 (N.D. Tex. Apr. 1, 2015).

[12] Order on Mot. to Expedite, *Bazini v. Bradley*, C.A. No. 3:15-CV-389 (N.D. Tex. Apr. 18, 2015).

[13] Def.'s Op. Br. 11; Mot. to Dismiss Filed by Pl. Adrian Dieckman, *Bazini v. Bradley*, 3:15-CV-389 (N.D. Tex. June 5, 2015).

Sunoco before his appointment and both of them allegedly had an understanding or agreement that they would be appointed to the Sunoco board after the closing of the Merger.

- Count III asserts a claim against ETP, EGP, ETE, and the members of the General Partner's board for aiding and abetting the breaches of contract in Counts I and II.

- Count IV asserts a claim for tortious interference with the LP Agreement against ETP, EGP, ETE, and the members of the General Partner's board.

On July 6, 2015, defendants filed a motion to dismiss, which was argued on December 10, 2015, after the completion of briefing.

## II. LEGAL ANALYSIS

### A. Legal Standard

This Court will grant a motion to dismiss under Court of Chancery Rule 12(b)(6) only if the "plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[14] In making this determination, the Court will "accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor."[15]

---

[14] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[15] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

13

Limited partnerships are governed by their partnership agreements and by the Delaware Revised Uniform Limited Partnership Act. The explicit policy of this Act is "to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."[16] Because limited partnership agreements are a type of contract, courts attempt to effectuate the contracting parties' intent when interpreting them.[17]

The expansive contractual freedom of limited partnerships relative to corporations is exemplified by the ability of limited partnerships to limit fiduciary duties under their partnership agreements.[18] Limited partnerships may expand or restrict the duties owed to the partnership or its partners.[19] When a limited partnership eliminates fiduciary duties, Delaware courts will refrain from providing the judicial review that typically is available to protect corporate stockholders. The only duty that may not be extinguished under the partnership agreement is the implied covenant of good faith and fair dealing.[20] Because the

---

[16] 6 *Del. C.* § 17-1101(c).

[17] *Norton v. K-Sea*, 67 A.3d at 360.

[18] *See id.*

[19] 6 *Del. C.* § 17-1101(d).

[20] *Id.*

partnership agreement governs the duties between partners, the Court must look to its text to determine the extent of these obligations.[21]

## B. Satisfaction of the Unitholder Approval Provision Requires Dismissal of Count I

Section 7.9(b) of the LP Agreement provides that whenever the General Partner makes a determination or takes any action, it must do so in good faith.[22] Count I of the Complaint asserts that the General Partner breached this provision because the General Partner knew that the Merger was not in the best interests of the Partnership and that it instead favored the interests of the General Partner's affiliates (ETE and ETP) on the theory that the Merger was timed to take advantage of the artificially depressed trading price of Regency's common units.[23]

In asserting this contract claim, plaintiff acknowledges that if any of the four safe harbors enumerated in Section 7.9(a) has been satisfied, the defendants would avoid the good faith inquiry in Section 7.9(b) and would be deemed not to have breached the LP Agreement.[24] This conclusion follows from the plain language of

---

[21] *In re K-Sea Transp. P'rs L.P. Unitholders Litig.*, 2012 WL 1142351, at *5 (Del. Ch. Apr. 4, 2012), *aff'd sub nom. Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354 (Del. 2013).

[22] LP Agreement § 7.9(b).

[23] Compl. ¶¶ 77-78.

[24] Pl.'s Ans. Br. 14.; *see also* Tr. Oral Arg. 94-96 (acknowledging that if one or more of the safe harbors is fulfilled, plaintiff will have no claim because of safe harbor provision).

15

the LP Agreement, which states, in relevant part, that a potentially conflicted act "shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity" if the act meets the requirements of one of the four safe harbors in Section 7.9(a).[25]

Defendants argue that the Merger is shielded from review under Section 7.9(b) because two of the safe harbors in Section 7.9(a) were satisfied, namely the Special Approval and the Unitholder Approval safe harbors. I need only address the parties' contentions concerning the Unitholder Approval safe harbor because it is dispositive.[26] That provision shields a conflicted transaction from review if the transaction was "approved by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates)."[27] It is undisputed that a majority of unaffiliated common units approved the Merger.[28]

---

[25] LP Agreement § 7.9(a). The term "Partners" includes all of Regency's limited partners who held common units and on whose behalf the claims in this case are asserted. *See id.* § 1.1, at A-4 (definition of "Common Units"), A-8 (definition of "Limited Partners"), A-11 (definition of "Partners").

[26] For the same reason, I need not address defendants' additional argument that Count I should be dismissed because the General Partner acted in reliance on a financial advisor and thus is conclusively presumed to have acted in good faith under Section 7.10(b) of the LP Agreement.

[27] LP Agreement § 7.9(a)(ii).

[28] *See supra* Part I.C.

16

Thus, the only question is whether some circumstance prevented this vote from being effective.

Plaintiff contends that defendants cannot invoke the Unitholder Approval safe harbor because the unitholders were not fully informed about the transaction. Specifically, plaintiff argues that the Proxy did not inform unitholders that Brannon was a Sunoco board member immediately before he joined the Conflicts Committee, or that Brannon and Bryant would join Sunoco's board after the Merger closed. According to plaintiff, the Proxy's omissions regarding Brannon and Bryant resulted in an uninformed base of unitholders, thereby negating the effect of the Unitholder Approval safe harbor. In making this argument, plaintiff relies on common law principles of ratification applicable to corporations governed by the Delaware General Corporation Law.[29]

As plaintiff points out, the doctrine of stockholder ratification requires stockholders to be fully informed in order for ratification to have legal effect.[30] If this requirement is met, an enhanced standard of review that otherwise may apply

---

[29] Pl.'s Ans. Br. 21-26.

[30] *See Michelson v. Duncan*, 407 A.2d 211, 220 (Del. 1979) ("Shareholder ratification is valid only where the stockholders so ratifying are adequately informed of the consequences of their acts and the reasons therefor."); *Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 586 (Del. Ch. 2015) ("[T]he affirmative defense of ratification is available only where a majority of informed, uncoerced, and disinterested stockholders vote in favor of a *specific decision* of the board of directors."); *Carlson v. Hallinan*, 925 A.2d 506, 530 (Del. Ch. 2006) ("To have any effect, stockholder ratification must be by a majority of the disinterested and fully informed stockholders.").

17

to a transaction may shift to business judgment review.[31]  If stockholders are not fully informed about a transaction when they are asked to vote on it, their approval of the transaction is insufficient to ratify it.[32]

The doctrine of stockholder ratification is closely related to the fiduciary duty of disclosure under Delaware corporate law.[33]  "In the corporate context, the duty of disclosure is a fiduciary duty that 'derives from the duties of care and loyalty.'"[34] The duty of disclosure is not an independent duty but rather "the application in a specific context of the board's fiduciary duties."[35]  The duty of disclosure requires directors to fully disclose all material information when seeking stockholder action.[36]  This encompasses situations in which a stockholder vote is

---

[31] *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 312-14 (Del. 2015); *Lewis v. Vogelstein*, 699 A.2d 327, 335-36 (Del. Ch. 1997) (Allen, C.) ("In all events, informed, uncoerced, disinterested shareholder ratification of a transaction in which corporate directors have a material conflict of interest has the effect of protecting the transaction from judicial review except on the basis of waste.").

[32] *Gentile v. Rossette*, 2005 WL 2810683, at *8 (Del. Ch. Oct. 20, 2005) ("Shareholder ratification of an interested transaction can only occur if the shareholders are fully informed."), *rev'd on other grounds*, 906 A.2d 91 (Del. 2006).

[33] *See Brown v. Perrette*, 1999 WL 342340, at *5 (Del. Ch. May 14, 1999) (noting that before becoming a standalone basis for a claim, a breach of the duty of disclosure was used to vitiate ratification and allow a transaction to be challenged).

[34] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1023 (Del. Ch. 2010) (quoting *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009)).

[35] *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001).

[36] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

18

not statutorily required but is sought for purposes of obtaining ratification.[37]  As a leading treatise explains, the latter situation "includes, for example, matters for which the corporation voluntarily seeks a ratification vote from the stockholders or some subset thereof, such as stockholder ratification of a stock option plan, a ratifying vote on an interested director transaction, or the vote of a majority of the minority stockholders."[38]

In the limited partnership context, "absent contractual modification, a general partner owes fiduciary duties that include a duty of full disclosure."[39]  But in stark contrast to the corporate context, in which fiduciary duties cannot be waived, a limited partnership may eliminate all fiduciary duties, including the duty of disclosure.[40]  Here, the LP Agreement did precisely that:

> Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner and the provisions of this Agreement, to the extent that they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of the General Partner or any other Indemnitee

---

[37] *See Lewis*, 699 A.2d at 330-31 (discussing disclosure obligations that may exist even when "shareholder approval was not required for the authorization of this transaction and was sought only for its effect on the standard of judicial review," and noting that, at the least, disclosure violations would invalidate ratification).

[38] 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 17.2[A], at 17-4 to -5 (3d ed. 2014) (internal citations omitted).

[39] *Lonergan*, 5 A.3d at 1023 (internal quotation marks omitted).

[40] 6 *Del. C.* § 17-1101(d).

otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of the General Partner or such other Indemnitee.[41]

As a result, although the duty of disclosure may be taken for granted in the corporate context and applies by default in the limited partnership context if not contractually modified, the LP Agreement extinguished the duty of disclosure and replaced it with the obligations explicitly stated in the LP Agreement. For this reason, it would be inappropriate to reinsert the duty of disclosure or any other common law disclosure requirements into the Unitholder Approval safe harbor.[42] Instead, I must look to the terms of the contract, including the implied covenant of good faith and fair dealing, in deciding whether there were any disclosure failures in this case that could nullify application of the Unitholder Approval safe harbor.

I first look to the express provisions of the LP Agreement. The LP Agreement contains only one disclosure requirement pertaining to the approval of a merger: "A copy or a summary of the Merger Agreement shall be included in or enclosed with the notice of a special meeting or the written consent."[43] Plaintiff

---

[41] LP Agreement § 7.9(e).

[42] *See, e.g.*, *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *19 (Del. Ch. June 12, 2014) (noting that because the LP Agreement eliminated all fiduciary duties, "the fiduciary duty precedents do not control," including the duty of disclosure); *Lonergan*, 5 A.3d at 1024 ("[T]he Holdings LP Agreement eliminates all fiduciary duties, which therefore cannot support a disclosure obligation.").

[43] LP Agreement § 14.3(a).

points to nothing in the LP Agreement suggesting that unitholders were entitled to any other information when they were asked to approve the Merger. Nor does plaintiff identify anything in the LP Agreement or in relevant case law suggesting that, as a matter of contract interpretation, the concept of approval under Section 7.9(a)(ii) would inherently require that unitholders be informed of all material information. Thus, I cannot read into the LP Agreement any such requirement as a matter of contract interpretation.[44] This restrained approach to interpreting limited partnership agreements squares with this Court's precedents.

In one of the *In re K-Sea Transportation Partners* opinions, for example, this Court examined a partnership agreement that similarly required the provision of a copy or summary of the relevant merger agreement to the limited partners and nothing else.[45] The *K-Sea* partnership agreement stated that, absent bad faith, conflicted actions taken by the general partner would not constitute a breach of the agreement or of any other duty.[46] Unlike here, there did not appear to be a provision explicitly waiving fiduciary duties in *K-Sea*. Nonetheless, the Court

---

[44] *See Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *6 (Del. Ch. Jan. 18, 2013) (noting that the Court will only look to default rules or norms outside the partnership agreement for guidance when "the partners have not expressly made provisions in their partnership agreement") (quoting *In re LJM2 Co-Inv., L.P.*, 866 A.2d 762, 777 (Del. Ch. 2004) (internal quotation marks omitted).

[45] *In re K-Sea Transp. P'rs L.P. Unitholders Litig.*, 2011 WL 2410395, at *8 (Del. Ch. June 10, 2011).

[46] *Id.*

21

concluded that the duty of disclosure had been replaced under the partnership agreement with the obligation to provide a copy or summary of the merger agreement.[47] Consequently, the Court in *K-Sea* denied the plaintiffs' motion to expedite, concluding that they had failed to state a claim for breach of the duty of disclosure under the lenient pleading standard of colorability.[48]

Here, not only does the LP Agreement contain just a single disclosure requirement, the limited partners also expressly agreed to waive all fiduciary duties not explicitly delineated in the LP Agreement.[49] Accordingly, the terms of the LP Agreement unambiguously extinguish the duty of disclosure and replace it with a single disclosure requirement. No other disclosure obligations exist under the express terms of the contract.

The implied covenant of good faith and fair dealing does not create any additional disclosure obligations either.[50] In the alternative entity context, an

---

[47] *Id.* ("Given the significant weight afforded to parties' freedom to contract, I read this provision as reflecting the parties' intent to preempt fundamental fiduciary duties of disclosure, limiting the requirements to those detailed in the [LP Agreement].").

[48] *Id.* at *5.

[49] LP Agreement § 7.9(e).

[50] Count II asserts a claim under the implied covenant of good faith and fair dealing, but plaintiff brings this claim only with regard to the substantive composition of the Conflicts Committee, rather than in relation to any alleged disclosure violations. Nevertheless, because the implied covenant of good faith and fair dealing cannot be waived, I briefly address its role with respect to plaintiff's disclosure allegations.

alleged breach of the implied covenant of good faith and fair dealing is contractual in nature.[51] The implied covenant fills gaps in contracts by implying terms "that the parties would have agreed to during their original negotiations if they had thought to address them," in order to fulfill the spirit of the parties' contractual bargain.[52] But if no gap exists, the implied covenant has no work to do. Furthermore, any gap must have existed when the parties entered into the agreement, because the implied covenant "looks to the past" at "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting."[53] In my view, the express waiver of fiduciary duties and the clearly defined disclosure requirement set forth in the LP Agreement prevent the implied covenant from adding any additional disclosure obligations to the agreement.

In *Lonergan v. EPE Holdings, LLC*, this Court assessed a situation in which, like here, a limited partnership agreement eliminated fiduciary duties and contained no contractual disclosure requirements other than giving unitholders a

---

[51] *See ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 439 & n.1 (Del. Ch. 2012) ("Under Delaware law, an implied covenant claim does not sound in tort. It is contractual."), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013).

[52] *Id.* at 440.

[53] *Id.*

23

copy or summary of the relevant merger agreement.[54]  In particular, the Court

considered whether the implied covenant of good faith and fair dealing imposed

any additional disclosure obligations on defendant.  The Court concluded:

> In light of the specific informational rights provided in Section 14.3,
> the absence of any generalized contractual obligation, and the express
> elimination of fiduciary duties, I cannot infer an obligation to disclose
> all material information from the implied covenant of good faith and
> fair dealing.  It would have been easy for the Holdings LP Agreement
> to provide for the disclosure of all material information.  Rather than
> suggesting a gap that needs to be filled, the Holdings LP Agreement
> reflects a conscious decision to eliminate all fiduciary duties,
> including the duty of disclosure.[55]

As in *K-Sea*, the Court in *Lonergan* denied the plaintiff's motion to expedite

because his claims failed even to meet the low standard of colorability.[56]  Here,

like in *Lonergan*, the implied covenant of good faith and fair dealing cannot

impose any additional disclosure obligations because doing so would contradict the

explicit arrangements set forth in the LP Agreement.

For the reasons explained above, I conclude that plaintiff has articulated no

express or implied disclosure requirements that would act as conditions to the

effectiveness of the Unitholder Approval safe harbor.  Indeed, the LP Agreement

contains no disclosure requirements other than the single obligation in Section 14.3

---

[54] 5 A.3d at 1024.

[55] *Id.*

[56] *Id.* at 1016, 1025.

24

to provide Regency's limited partners with a copy or summary of the merger agreement. Plaintiff does not contend that defendants failed to satisfy this limited disclosure obligation, or that the Merger, which was approved by almost 60% of the unaffiliated units outstanding and over 99% of those that were voted, failed to obtain the requisite vote of unaffiliated unitholders. Accordingly, the Unitholder Approval safe harbor applies here.

Because that safe harbor applies, "any resolution or course of action by the General Partner or its Affiliates in respect of [a potential conflict of interest] shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity."[57] Under these express terms, plaintiff's challenge to the Merger as a conflicted transaction cannot state a claim for breach of the LP Agreement. To the contrary, because the Unitholder Approval safe harbor was satisfied, the Merger is deemed approved by all the limited partners, including plaintiff, and is immune to challenge for a contractual breach. In *Allen v. Encore Energy Partners, L.P.*, the Supreme Court concluded that such a contractually deemed approval put an end to the analysis of the plaintiff's breach of contract claim.[58] Here, too, because the

---

[57] LP Agreement § 7.9(a).

[58] 72 A.3d at 110 (noting that, because Special Approval had triggered a similar safe harbor provision deeming a conflicted action permitted and approved, the Special Approval "requires us to conclude that [the] allegations fail to state a claim against any

transaction is deemed approved by all of Regency's limited partners and deemed not to be a breach of the LP Agreement, Count I of the Complaint fails to state a claim for relief.

In reaching this conclusion, I recognize it may seem harsh to shield a conflicted transaction from judicial review under Delaware law based on a vote of unitholders without requiring the disclosure of all material information.[59] When considering the rights of persons who choose to invest in alternative entity structures, however, it always must be kept in mind that the express policy of this State is to give maximum effect to the principle of freedom of contract.[60] This policy affords commercial parties the advantage of great flexibility to privately order their affairs, but that flexibility can come at a cost. As our Supreme Court recently reminded us, investors "must be careful to read those agreements and to

---

Defendant"); *see also Gerber*, 2013 WL 209658, at *9 (concluding that defendants had satisfied their express obligations under the partnership agreement because they had achieved Special Approval, causing the transaction to be deemed approved and not a breach of the partnership agreement); Tr. Oral Arg. 94-96 (conceding that if the Unitholder Approval Provision were effective, plaintiff would not state a claim, while disputing its effectiveness based on alleged disclosure deficiencies).

[59] To be clear, I express no opinion concerning whether the alleged omissions from the Proxy concerning Brannon and Bryant were material. Resolution of that issue is not necessary to this decision.

[60] 6 *Del. C.* § 17-1101(c) (governing limited partnerships); 6 *Del. C.* § 18-1101(b) (governing limited liability companies).

26

understand the limitations on their rights" they impose.[61] This case serves as another reminder.

The contractual right of limited partners to eliminate state law fiduciary duties, moreover, does not mean that Regency's investors were without recourse concerning the quality of the information they received before voting on the Merger. Federal securities laws still apply.[62] Indeed, as noted above, federal disclosure claims concerning the Merger had been pursued in federal court in Texas before this action was filed. The plaintiff here initially was part of that litigation but chose to abandon his federal claims in Texas to pursue contractual claims in this action instead. Having done so, he must be prepared to accept the consequences of the contractual scheme that governs his investment in Regency.

## C. Count II Fails to State a Claim for Relief Under the Implied Covenant of Good Faith and Fair Dealing

Count II of the Complaint asserts that the General Partner breached the implied covenant of good faith and fair dealing by appointing Brannon and Bryant

---

[61] *The Haynes Family Trust v. Kinder Morgan G.P., Inc.*, 2016 WL 912184, at *1 (Del. Mar. 10, 2016) (ORDER).

[62] *See Lonergan*, 5 A.3d at 1025; *see also J. I. Case Co. v. Borak*, 377 U.S. 426, 430-32 (1964) (holding that Section 14(a) of the Securities Exchange Act of 1934 provides stockholders a private right of action against management for misleading or inadequate disclosures in proxy statements); *TSC Indus. v. Northway, Inc.*, 426 US. 438, 448 (1976) (noting that remedial purpose of Rule 14a-9 is to prohibit the issuance of misleading proxy statements to enable stockholders to make an informed choice).

to the Conflicts Committee despite their alleged conflicts of interest.[63]   According to plaintiff, the parties to the LP Agreement did not anticipate that the General Partner's board would form a Conflicts Committee (a) consisting of one member (Brannon) who resigned from the board of a Regency affiliate (Sunoco) the same day he was appointed to the Conflicts Committee, and (b) whose members would be appointed (Bryant) or reappointed (Brannon) to that same affiliate's board a few days after the transaction closed.  Defendants counter that there is no gap in the LP Agreement for the implied covenant to fill because the LP Agreement sets forth clear standards defining the requirements for membership on the Conflicts Committee, including the requirement that a member may not serve simultaneously on the board of an affiliate while serving on the Conflicts Committee.[64]

A claim for breach of the implied covenant of good faith and fair dealing requires that plaintiff allege "(1) a specific implied contractual obligation, (2) a

---

[63] Compl. ¶ 85.

[64] These requirements are found in the definition of "Conflicts Committee" in the LP Agreement, which prescribes in the present tense which members of the General Partner's board may not serve on such a committee:  "[A] committee of the Board of Directors of the general partner of the General Partner [Regency GP LLC] composed entirely of two or more directors who *are not* (a) security holders, officers or employees of the General Partner, (b) officers, directors or employees of any Affiliate of the General Partner or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading."  LP Agreement § 1.1, at A-5 (emphasis added).

28

breach of that obligation by the defendant, and (3) resulting damage to the plaintiff."[65] At a minimum, the Complaint fails to satisfy the third element.

The LP Agreement does not require that a conflicts committee be created to assess a potentially conflicted transaction. Using such a committee is merely one of several optional safe harbor provisions recognized in the LP Agreement, the use of which defendants were free to forgo, even in the face of an admittedly conflicted transaction.[66] Satisfaction of the Unitholder Approval safe harbor, moreover, provides an independent basis on which to conclude that a conflicted transaction does not constitute a breach of the LP Agreement "or of any duty stated or implied by law or equity."[67] Thus, as plaintiff concedes, if another safe harbor were effective, it would make no difference whether or not defendants' use of the Special Approval safe harbor was effective.[68]

---

[65] *Overdrive, Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *8 (Del. Ch. June 17, 2011).

[66] *See* LP Agreement § 7.9(a) ("The General Partner shall be authorized but not required in connection with its resolution of such conflict of interest to seek Special Approval . . . ."); Tr. Oral Arg. 93 (acknowledging that Merger could be executed without using the Special Approval Provision).

[67] *Id.*

[68] *See* Tr. Oral Arg. 93-96.; *see also Lonergan*, 5 A.3d at 1020 (interpreting similar list of safe harbors) ("By using the term 'or,' Section 7.9(a) establishes four alternative standards of review. If the Proposed Transaction meets any of the four, then it 'shall be permitted and deemed approved by all Partners . . . .'").

29

"[T]o properly plead a claim for breach of the implied covenant, [plaintiff] must allege some injury to his contractual interest as a result of the breach of the implied obligation."[69] Here, the Unitholder Approval safe harbor is effective and the Special Approval safe harbor is redundant. Consequently, plaintiff has not adequately alleged an injury to sustain a claim for breach of the implied covenant based on an alleged gap relating to the Special Approval safe harbor. Count II thus fails to state a claim that could provide a basis for relief.[70]

### D. Count III Fails to State a Claim for Aiding and Abetting

Count III of the Complaint asserts that ETP and the individual defendants aided and abetted breaches of contract committed by the General Partner. It further alleges that EGP and ETE are liable based on their indirect control of ETP. As explained above, the alleged breaches of contract under Counts I and II fail to state claims for relief.[71] Without an underlying breach of contract, there can be no

---

[69] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888-89 (Del. Ch. 2009).

[70] As discussed above, plaintiff does not assert an implied covenant claim based on any disclosure obligations relating to the Unitholder Approval safe harbor, and any such argument would have been without merit given the explicit waiver of fiduciary duties in the LP Agreement. *See* Part II.B.

[71] *See supra* Part II.B-C.

liability for aiding and abetting a breach.[72]  Count III thus fails to state a claim for relief.

### E.     Count IV Fails to State a Claim for Tortious Interference

Count IV of the Complaint asserts that certain defendants tortiously interfered with plaintiff's contractual rights under the LP Agreement.  It must be dismissed for reasons similar to those regarding Count III.  A claim for tortious interference with contract requires, among other things, "an intentional act that is a significant factor in causing the breach of [the] contract."[73]  An exception to this requirement exists when "defendant's wrongful conduct . . . induces the termination of the contract, irrespective of whether the termination is lawful."[74]  In this case, there was neither a breach of contract nor the inducement of any termination.  Rather, plaintiff's conclusory allegations state only that defendants' actions constituted a "tortious interference with [the unitholders'] contractual rights

---

[72] *See In re Alloy, Inc.*, 2011 WL 4863716, at *14 (Del. Ch. Oct. 13, 2011) (addressing liability for aiding and abetting breach of fiduciary duty) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.").

[73] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.7 (Del. 2005) (reciting the elements of tortious interference and noting that they are "well established").

[74] *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 752 (Del. 2010).

under the Regency LP Agreement."[75]  Because no breach or termination occurred, Count IV fails to state a claim for tortious interference with contract.

## III.  CONCLUSION

For the foregoing reasons, the Complaint has failed to state a claim upon which relief can be granted.  Accordingly, defendants' motion to dismiss is GRANTED.

**IT IS SO ORDERED**.

---

[75] Compl. ¶ 104.